FILED
2026 Jul-07  PM 04:06
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| ROBERT BARBER, JOSE OSORIO, and ANDRE MOREIRA,<br><br>     Plaintiffs,<br><br>v.<br><br>MADDING KING, BROOKLINE INVESTMENTS, INC., and BROOKLINE GROUP, LLC,<br><br>     Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)    Civil Action No. _____<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## <u>COMPLAINT</u>

Plaintiffs Robert Barber ("Barber"), Jose Osorio ("Osorio"), and Andre Moreira ("Moreira") (collectively, "Plaintiffs"), by and through their undersigned counsel, bring this action against Defendants Madding King ("King"), Brookline Investments, Inc. ("Brookline Investments"), and Brookline Group, LLC ("Brookline Group"; together with Brookline Investments, the "Brookline Entities"; and collectively with King, "Defendants"), and allege as follows:

## I.    NATURE OF THE ACTION

1.    This action arises from a coordinated fraudulent scheme orchestrated by King, acting individually and through the Brookline Entities, to solicit, pool, and misappropriate more than $3,643,000 of Plaintiffs' capital through unregistered, off-exchange, leveraged retail commodity transactions promoted to retail investors

1

under false assurances of account segregation, professional risk management, and unrestricted access to funds.

2.    King functioned as the central intermediary, inducement actor, and decision maker for each Plaintiff. He held himself out as a sophisticated former Chicago Mercantile Exchange trader and as a principal of the Brookline Entities. He used Brookline Entity email infrastructure, copied Brookline leadership on material communications, and leveraged his Brookline affiliation to lend institutional legitimacy to what was, in substance, an unregistered commodity solicitation and an unregistered commodity pool operated outside the framework of federal and state regulation.

3.    Throughout 2024, after Plaintiffs funded their accounts in reliance on Defendants' representations regarding segregation and risk controls, King and his co-conspirators (including a United Kingdom based trader and broker not named as Defendants in this Complaint) abandoned the represented risk parameters, pooled Plaintiffs' funds with those of other investors, and incurred catastrophic losses. King then represented that Plaintiffs' account balances had been "credited" back to original levels, but conditioned any withdrawal on group-level recoupment. To date, no Plaintiff has been permitted to withdraw a single dollar.

4.    King's own contemporaneous written admissions place these facts beyond reasonable dispute. King admitted that promised stop-loss and drawdown

protections were overridden; that funds were commingled and treated on a group basis; that he personally approved drawdowns in excess of represented limits; and that withdrawals would not be permitted until pooled losses were recouped. On December 12, 2024, King admitted in writing that there had been "continual complete disregard of everything I have been trying to implement" and that he had "forbidden trading in the accounts."

5. Plaintiffs assert claims under the Commodity Exchange Act (the "CEA"), 7 U.S.C. §§ 1 et seq., including but not limited to 7 U.S.C. §§ 2(c)(2)(C), 2(c)(2)(D), 6(b), 6b, 6c(b), 6d, 6m, 6o, 13c(a), and 25(a); under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5; under the Florida Securities and Investor Protection Act, Fla. Stat. §§ 517.301 and 517.211; and under Alabama common law for fraudulent inducement, fraudulent suppression, breach of fiduciary duty, conversion, civil conspiracy, negligent supervision, and unjust enrichment. Plaintiffs further seek to pierce the corporate veil and hold King and the Brookline Entities jointly and severally liable as alter egos of one another.

6. Plaintiffs seek compensatory damages of not less than $3,643,000 in invested principal; lost investment gains; punitive damages; rescission and disgorgement; pre- and post-judgment interest; attorneys' fees and costs to the extent permitted by statute; and equitable relief, including the preservation of assets and an

accounting.

## II.   PARTIES

7.      Plaintiff Robert Barber is, and at all times material hereto has been, a resident and citizen of Jefferson County, Alabama.

8.      Plaintiff Jose Osorio was, at the time of the acts and omissions giving rise to this action, a resident of Jefferson County, Alabama. Osorio is now a resident and citizen of the State of Florida.

9.      Plaintiff Andre Moreira is a citizen of the Federative Republic of Brazil who, during the relevant period, had substantial in-person and electronic contact with King in the State of Florida, including a personal meeting at King's Miami Beach residence on or about February 18, 2024.

10.     For the avoidance of doubt, and without prejudice to any other allegation in this Complaint, Plaintiffs Barber and Osorio acknowledge and allege that at the times material to the transactions giving rise to this action, they had "amounts invested on a discretionary basis" sufficient to qualify as eligible contract participants under 7 U.S.C. § 1a(18)(A)(xi)(I). Plaintiff Moreira was not, and at all times material to this action has not been, an eligible contract participant within the meaning of 7 U.S.C. § 1a(18). The claims of Plaintiffs Barber and Osorio are accordingly brought under the private rights of action provided by 7 U.S.C. § 25(a)(1)(A) (with respect to trading advice received from Defendants for compensation) and 7 U.S.C.

§ 25(a)(1)(B) (with respect to transactions made through Defendants and money deposited with Defendants in connection with such transactions), and do not depend upon the characterization of the transactions at issue as "retail commodity transactions" under 7 U.S.C. § 2(c)(2)(D)(i) or "retail forex transactions" under 7 U.S.C. § 2(c)(2)(C)(i). The claims of Plaintiff Moreira are brought under 7 U.S.C. § 25(a)(1)(A), (B), and (D).

11.     Defendant Madding King is an individual who, through his actions and his sworn regulatory filings, has held himself out as a resident of the State of Alabama. King is the current registered agent in Alabama for at least twenty (20) Alabama companies. Under Ala. Code § 10A-1-5.31(b)(2)(A), registered agents must be Alabama residents, and the forms filed by King with the Alabama Secretary of State are signed under penalty of perjury. King is the managing member, Chief Executive Officer, and owner of Brookline Group, and a former (or current) investment adviser representative and managing director associated with Brookline Investments. On July 23, 2025, King signed and filed with the United States Securities and Exchange Commission a Form D - Notice of Exempt Offering of Securities reporting total sales of $3,385,000 and listing himself as a "Related Person" at a Birmingham, Alabama address. On September 26, 2025, King signed and filed a further Form D reporting total sales of $4,420,000 and again listing a Birmingham, Alabama address.

12.    Defendant Brookline Investments, Inc. is an Alabama corporation with its principal place of business in Jefferson County, Alabama. Brookline Investments is named as a Defendant in this action based on King's use of Brookline Investments' institutional affiliation, infrastructure, and personnel to solicit, onboard, and manage Plaintiffs' accounts.

13.    Defendant Brookline Group, LLC is an Alabama limited liability company with its principal place of business in Jefferson County, Alabama. King is the CEO and an owner of Brookline Group. King used the Brookline Group email domain in numerous material communications with Plaintiffs concerning the matters alleged herein.

14.    Non-parties Daniel Kingsley (a United Kingdom resident and the "trader" referenced throughout King's communications) and VortexFX UK, Ltd. (a United Kingdom corporation, or, in the alternative and on information and belief based on representations made by Mr. Kingsley to Plaintiff Osorio on or about October 29, 2025, an entity registered in Saint Lucia under registration number 2023-00517 and operating through United Kingdom-based personnel, that operated the MetaTrader 5 broker platform used in the scheme) participated in the conduct alleged herein. Plaintiffs reserve the right to amend this Complaint to add additional defendants, including but not limited to Mr. Kingsley, VortexFX UK, Ltd., any related or successor Saint Lucia entity, and any related entities, upon completion of

6

jurisdictional and conflict-of-laws analysis and subject to applicable tolling agreements.

## III.  JURISDICTION AND VENUE

15.    This Court has subject matter jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. § 1331, and over the CEA claims specifically pursuant to 7 U.S.C. § 25(c), which vests the United States District Courts with exclusive jurisdiction over private rights of action under the CEA. The Court has jurisdiction over Plaintiffs' federal securities claims pursuant to Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa.

16.    This Court has supplemental jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367 because those claims arise from the same case or controversy and the same nucleus of operative facts as the federal claims, namely King's solicitation, misrepresentation, account setup, and subsequent management and loss of Plaintiffs' combined $3,643,000 investment.

17.    Venue is proper in this District under 7 U.S.C. § 25(c), which provides that any action under 7 U.S.C. § 25(a) "may be brought in any judicial district wherein the defendant is found, resides, or transacts business, or in the judicial district wherein any act or transaction constituting the violation occurs." Venue is also proper under 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b). Defendants reside and transact business in this District, and a substantial part of the events and omissions giving

rise to the claims occurred in this District.

18.     Personal jurisdiction over each Defendant is proper. King has held himself out as an Alabama resident under penalty of perjury in sworn regulatory filings and is the registered agent of approximately twenty (20) Alabama entities. The Brookline Entities are Alabama entities with their principal places of business in Jefferson County, Alabama. Each Defendant purposefully directed solicitation, account-onboarding, KYC collection, transactional, and risk-management communications into the State of Alabama and toward Plaintiffs Barber and Osorio during their Alabama residency, and continued to do so as the scheme unfolded.

## IV.  TOLLING AGREEMENT

19.     On or about January 30, 2026, each Plaintiff entered into a written Tolling Agreement with King. Pursuant to those Tolling Agreements, all applicable periods of limitation, whether contractual, statutory, or equitable, for the filing of any civil action arising from or in any way connected with claims against King are tolled from the Effective Date (January 30, 2026) through the Expiration Date (July 30, 2026), or such later date as the parties may agree in writing or as may follow from any party's sixty (60) days' notice of termination.

20.     Plaintiffs further allege that the wrongful conduct alleged herein has been continuing in nature, with discrete acts of concealment, denial of withdrawals, and post-loss balance manipulation occurring through and including the date of

filing of this Complaint, such that the statute of limitations did not begin to run, and has not run, on the claims asserted herein.

21.    Plaintiffs further allege that, with respect to claims against Defendants Brookline Investments, Inc. and Brookline Group, LLC, who are not parties to the Tolling Agreements referenced above, the discovery rule, the continuing-violations doctrine and the doctrine of equitable tolling independently preserve all claims asserted against the Brookline Entities. Plaintiffs first had a reasonable basis to discover the institutional role of the Brookline Entities in the scheme on or about December 16, 2024, when King admitted in writing the multi-entity structure of his operations and identified four separate vehicles (IDFUND, Solaris VC Fund, XETA Capital Fund, and Vortex FX) through which Plaintiffs' capital had been deployed. Prior to that date, Plaintiffs had no reasonable basis to distinguish the institutional participation of the Brookline Entities from the personal conduct of Defendant King.

## V.   FACTUAL ALLEGATIONS

### A. <u>Overview of the Scheme</u>

22.    Defendants, individually and in coordination with non-party Daniel Kingsley and VortexFX UK, Ltd., operated and promoted a leveraged retail commodity trading program centered on margined spot gold (XAU/USD) and related foreign-exchange contracts for difference ("CFDs"), executed through the Meta-Trader 5 ("MT5") platform via VortexFX. The scheme also involved a predecessor

offshore vehicle, Xeta Capital Fund ("XCF"), a related United Arab Emirates liquidity provider ("RLP"), and additional referenced entities including HEX, ECG, and Gaxsys.

23.    King was the sole point of contact for each Plaintiff. He controlled solicitation, onboarding, funding, communications, risk parameter representations, and post-loss explanations. Plaintiffs did not interact directly with any registered futures commission merchant, retail foreign exchange dealer, introducing broker, commodity pool operator, or commodity trading advisor

24.    Neither King, Brookline Investments, nor Brookline Group is or has been registered with the Commodity Futures Trading Commission ("CFTC") or the National Futures Association ("NFA") as a futures commission merchant, retail foreign exchange dealer, introducing broker, commodity pool operator, or commodity trading advisor at any time material hereto. None of the leveraged retail commodity transactions at issue were executed on or subject to the rules of a designated contract market within the meaning of the CEA.

25.    King solicited Plaintiffs to fund their accounts by transferring USDC stablecoins to digital wallet addresses he provided. King personally controlled at least one of those wallets (0x6fbd24f2143e0e93ba7d93edb218e0f3bf1e4cb1) and directed Moreira to fund through King's personal wallet. King required Plaintiffs to submit driver's licenses, proofs of address, and other sensitive Know-Your-

Customer ("KYC") information to him as a precondition to participation.

B. **Robert Barber**

26.    Plaintiff Barber first learned of the program in 2023 through Plaintiff Osorio, who reported strong returns on his own investment with King. Barber initially declined an introduction and elected to monitor the reported performance from a distance.

27.    After Osorio reported continued strong returns, a conference call was arranged in late 2023 or early 2024 among Barber, King, and Osorio. During that call, Barber raised two specific and material objections: (i) he refused to participate in any pooled trading arrangement and insisted on a segregated individual account from which he could withdraw at any time; and (ii) he refused to invest under any strategy that lacked disciplined downside risk management.

28.    In direct response, King made two specific representations to Barber: (i) he would arrange an individual trading account controlled by King to address Barber's segregation requirement; and (ii) he personally worked with the trader to develop the strategy and trading algorithm and that appropriate stop-loss protections were in place to limit downside risk. Barber's decision to invest was predicated entirely on these representations.

29.    In early March 2024, Barber informed King he would invest $1,000,000 in direct reliance on King's representations. On March 13, 2024, at 9:14 a.m., King

11

emailed Barber requesting a public blockchain address, front and back of his driver's license, and proof of address. Barber complied later that morning, providing his MetaMask address, his driver's license, and a bank statement.

30.    On March 14, 2024, at 8:29 a.m., King emailed Barber MT5 download instructions and directed Barber to select "Vortex FX Ltd." as the broker. Later that day, King provided the funding wallet address. Barber funded the account in reliance on King's representations and ultimately deposited $1,000,000.

31.    Within weeks of Barber funding the account, the represented risk controls were abandoned. King later admitted that the represented 30% stop-loss was removed or overridden, that drawdown limits were exceeded with his approval, and that Plaintiffs' funds were treated on a pooled or group basis. Following catastrophic losses commencing on or about April 1, 2024, King represented that Barber's account had been "credited" back to its original $1,000,000 balance and that withdrawals would be available.

32.    Despite those representations, Barber was never permitted to withdraw any funds. King later disclosed that withdrawals would not be permitted until pooled losses were recouped at the group level. Barber's $1,000,000 principal remains frozen and inaccessible.

33.    Plaintiff Barber did not learn, and could not reasonably have discovered, that his invested capital had been pooled with funds of other investors and

12

routed through multiple entities (including Brookline Investments, Inc. and Brookline Group, LLC) until on or about December 16, 2024, when King admitted in writing the multi-entity structure of his operations to Plaintiff Osorio, the substance of which was communicated to Barber contemporaneously. Prior to that date, Barber understood his investment to be held in a segregated trading account at MetaTrader 5 / Vortex FX, as represented by King.

## C. **Jose Osorio**

34.     Plaintiff Osorio was an earlier investor with King and served as a referral source for both Barber and Moreira. Osorio was solicited by King during his Alabama residency through telephone, in-person, and electronic communications. King used his Brookline Group, LLC email account in numerous communications with Osorio. Osorio did not learn, and could not reasonably have discovered, that his invested capital had been pooled and commingled with the funds of other investors (rather than held in an individual or segregated account) until on or about December 16, 2024, when King admitted in writing to Osorio that his capital had been deployed across four separate entities (IDFUND, Solaris VC Fund, XETA Capital Fund, and Vortex FX), each with different management and redemption procedures. The pooled and commingled nature of the investment was further confirmed by subsequent communications and conduct of Defendants in the months thereafter, including the synchronized rejection of three of Osorio's withdrawal requests on May

13, 2026.

35.    Rainer Twiford, President of Brookline Investments, was copied on numerous emails from King to Osorio concerning the subject matter of this action, including communications regarding leveraged gold trading, pooled investments, VortexFX, and Mr. Kingsley. Mr. Twiford thereby received actual or constructive notice of King's conduct in his capacity as the President of Brookline Investments.

36.    Osorio's total investment with King and his affiliated entities is approximately $1,143,000, transferred through three separate funding rails over a period of approximately fourteen months and across three distinct corporate vehicles controlled by King.

37.    First, on or about September 28, 2022, Osorio wired $50,000 to ID Funds 3 LLC at Signature Bank (routing number 071026628, account number 7000099003, reference "ID Funds 3 LLC - Ripple 2") for an investment in Ripple Labs equity. The wire instructions were provided by Michael Gustman of IDFUND, Head of Operations. King personally confirmed receipt on October 4, 2022 in a direct email to Osorio stating: "We got it. Thank you."

38.    Second, on or about May 31, 2023, Osorio wired approximately $50,000 to Brookline Investments, Inc. at 2830 Cahaba Road, Suite 100, Birmingham, Alabama 35223, for the Solaris VC Fund. Receipt was confirmed by Sarah Beth Cain, Chief Financial Officer of Brookline Investments, by email on or about

June 1, 2023.

39.    Third, between October 26, 2023 and November 20, 2023, Osorio transferred a total of approximately $993,125.62 in USDC stablecoin via the Ethereum blockchain from ALT5 exchange account to a deposit address provided by King. The three transfers were: (a) 99,410.46 USDC on October 26, 2023 (transaction hash 0x832d39c3...); (b) 497,231.38 USDC on October 31, 2023 (transaction hash 0x8f266646...); and (c) 397,776.15 USDC on November 20, 2023 (transaction hash 0xfdf1fdfc...). Each transfer is independently and immutably verifiable on the public Ethereum blockchain.

40.    In the days immediately preceding the largest of these USDC transfers, King, writing from the email address madding@solaris-vc.com, represented to Osorio on November 7, 2023 and again on November 19, 2023 that changes to the XETA Capital Fund cap structure would "not affect" Osorio's account; that Osorio's account would "continue to accrue at the current 20% cap per month rate"; and that an application programming interface feed, daily reporting, and individual sub-account access would be available within three to four weeks. None of those representations was true. The promised reporting infrastructure was never delivered, the represented "20% cap per month" was not achievable, and the changes to the XETA Capital Fund structure did in fact affect Osorio's account.

41.    On or about January 27, 2024, King, writing from the email address

mking@brookline-group.com, separately solicited Osorio to invest in a purported "Ripple Shares Arbitrage Fund" promising returns of "20-30% annually" on a minimum investment of $50,000. The solicitation invoked the Brookline Group, LLC corporate identity and infrastructure.

42.    On or about February 22, 2024, King, writing from the email address madding@m3bvi.com, communicated a purported "change in procedure" transitioning Osorio's account from a 24% net rate under Solaris VC Fund/Brookline Investments management to a "straight 50-50 profit split with the trader." King characterized the new structure as "more transparent." King did not disclose his own financial interest in the profit-sharing arrangement with the trader or with Vortex FX.

43.    On or about March 1 and March 2, 2024, following loss events that affected the pooled accounts, King forwarded to Osorio a representation from the trader (subsequently identified as Daniel Kingsley) that "anyone who's lost will be compensated. We have a fund just allocated for screw ups like this," and that the accounts "will be reconciled before going into next week." This compensation was never provided to Osorio, and Osorio's losses were not made whole.

44.    On or about December 15, 2024, Osorio submitted a formal written withdrawal demand to Kevin Hall, Chief Executive Officer of Vortex FX, seeking release of $2,000,000 from Osorio's Vortex account number 295029, the represented value of which had previously reached approximately $8,000,000 prior to the

February 2024 trading losses.

45.    On or about December 16, 2024, in direct response to that withdrawal demand, King wrote to Osorio: "It's still just poking on the wrong entity. Jan and Feb, you had no Vortex account. Kevin Hall has zero responsibility for XCF. Dan maybe for being a dumbass, but not Vortex proper. The issue is that your capital was invested through multiple entities: 1. IDFUND (initial Ripple investment) 2. Solaris VC Fund (managed trading) 3. XETA Capital Fund (derivative positions) 4. Vortex FX (current holding platform). Each has different management and redemption procedures." King's December 16, 2024 email is a direct admission that Osorio's capital was pooled across at least four entities controlled by or affiliated with King, and that King used the multi-entity structure as a shield against redemption demands.

46.    On or about October 29, 2025, Daniel Kingsley, identifying himself as Senior Trader for Vortex FX (registered in Saint Lucia under registration number 2023-00517), wrote to Osorio and other clients that "The baseline or principal figure of each client's account remains fully protected and will not change regardless of trading conditions" and that "client capital itself remains secure and unaffected." That representation was made years after the February 2024 and September 2024 catastrophic loss events.

47.    On or about January 28, 2026, King, writing from the email address mking@idfund.co, represented an aggregate portfolio with total investments across

12 companies and a claimed portfolio value of more than $150 million, with primary holdings in Ripple, XETA Capital Fund, and Solaris VC Fund.

48. On or about February 2, 2026, Daniel Kingsley further represented to Osorio that "we remain committed to beginning redemptions within the coming months" and that "all capital is secure and accounted for." No redemptions began.

49. On or about May 13, 2026, Vortex FX, through its automated client management system (crm@vortexfx.com), rejected three separate withdrawal requests submitted by Osorio within a thirteen-minute period: (a) a $9,700.00 USDC request; (b) a $971.00 USD request; and (c) a $6,797.00 USD request. Each rejection was issued without any stated reason. The synchronized, automated, unexplained rejection of three distinct withdrawal requests within thirteen minutes evidences a systematic policy of obstructing Osorio's redemption rather than any legitimate, individualized business decision.

50. Osorio's entire approximately $1,143,000 principal remains frozen and inaccessible across the IDFUND, Solaris VC Fund, XETA Capital Fund, and Vortex FX vehicles. To date, despite repeated written demand, Osorio has been permitted to withdraw no portion of his invested principal.

51. King made the same categories of representations to Osorio as to Barber and Moreira regarding profitability, account legitimacy, professional risk management, and access to funds. Osorio relied on those representations in committing

18

capital and in encouraging Barber and Moreira to do the same.

52. Osorio experienced the same drawdowns and loss events as Barber and Moreira beginning on or about April 1, 2024. Osorio's account was credited following losses, consistent with King's treatment of all Plaintiffs' accounts. Osorio has been refused permission to withdraw any funds following the credits and his principal remains frozen.

**D. <u>Andre Moreira</u>**

53. Plaintiff Moreira was introduced to King in November 2023 by Osorio, who told Moreira he had invested $1,000,000 with King and was receiving monthly returns of approximately 20%. Osorio represented that King worked at an asset management firm and had personally invested approximately $3,000,000 of his own savings in the program, from which he was withdrawing significant sums.

54. On November 3, 2023, King and Moreira held an initial Google Meet conference. During that and subsequent conversations, King represented that: (i) the program traded gold and currency pairs; (ii) King was the intermediary responsible for defining strategy and managing the trading robots; (iii) King had prior experience as a trader at the Chicago Mercantile Exchange; and (iv) the investment was exclusive, professionally managed, and disciplined as to risk.

55. Relying on those representations, Moreira made an initial investment of approximately USDC 100,000 (net amount received by King: USDC 99,991.35),

funded via on-chain transfer to a wallet controlled by King. Within days, Moreira received reporting emails from "reporting@m3bvi.com" reflecting balance increases of 2.43% in two days, and subsequent reports reflecting continued growth. On or about February 6, 2024, in reliance on the reported growth and King's representations, Moreira committed an additional USDC 200,000 to King's wallet (net received: USDC 199,994.39). On or about February 9, 2024, Moreira committed a further USDC 100,000 (net received: USDC 100,985.46).

56.    On February 18, 2024, Moreira met King in person for lunch at The Continuum, a luxury condominium in Miami Beach, Florida, which King represented was his second home. Moreira was accompanied by his twelve-year-old son and by Osorio. King continued his representations regarding profitability, exclusivity, and his personal expertise during that meeting.

57.    Moreira ultimately committed a total of approximately $1,500,000 to the program (net amount received by King across all transfers approximately $1,490,892.67), in reliance on King's representations. Following the April 2024 losses that affected all Plaintiffs, Moreira was represented to have an account balance exceeding $5,000,000. King thereafter informed Moreira that withdrawals were impossible because the trader wished to "put a dent" in the credited amounts by continuing to trade with Moreira's money until an undisclosed sum was recouped. Moreira's principal remains frozen and inaccessible.

58.     Plaintiff Moreira did not learn, and could not reasonably have discovered, that his invested capital had been pooled with funds of other investors and routed through multiple entities (including Brookline Investments, Inc. and Brookline Group, LLC) until on or about December 16, 2024, when King admitted in writing the multi-entity structure of his operations to Plaintiff Osorio, the substance of which was communicated to Moreira contemporaneously. Prior to that date, Moreira understood his investment to be held in a segregated trading account at MetaTrader 5 / Vortex FX, as represented by King.

### E.  **King's Admissions**

59.     King's contemporaneous written communications repeatedly admit the falsity of the representations on which Plaintiffs relied and the abandonment of the risk parameters he represented were in place.

60.     On October 17, 2024, King admitted in writing that he was "pausing all trading" and that the "current strategy is certainly not a good fit for the existing market," acknowledging back-to-back significant losses in the core strategy.

61.     On November 21, 2024, King wrote that the trading had resumed intermittently but that "on two occasions, the algo did not recognize an open position, and we had to close them manually," adding, "I am not ok with that." King also acknowledged that "Xeta is still a quagmire" and that the brokers at one point were generating $3-5 million per month on the entire "Xeta Capital pool."

62. On December 12, 2024, King admitted in writing that there had been "continual complete disregard of everything I have been trying to implement over the past two months" and that he had "forbidden trading in the accounts until, at the very least, the XCF accounts are liquidated and/or the full initial principal is returned."

63. On December 16, 2024, in direct response to a written withdrawal demand by Plaintiff Osorio, King admitted in writing the multi-entity structure of the scheme, identifying four separate vehicles through which Plaintiffs' capital had been deployed: (1) IDFUND, for the initial Ripple investment; (2) Solaris VC Fund, for managed trading; (3) XETA Capital Fund, for derivative positions; and (4) Vortex FX, as the current holding platform. King further admitted that "each has different management and redemption procedures," using the multi-entity structure to deflect responsibility from any single Defendant or Defendant-affiliated entity.

64. On January 20, 2025, King wrote regarding XCF that he had "no idea" whether settlement discussions with the broker ECG would yield "100 cents on the dollar, a return of initial invested capital, or something in between," and that he had "no idea of the end resolution."

65. On or about January 28, 2026, King represented in writing that he managed an aggregate investment portfolio across twelve (12) companies with a claimed total portfolio value of more than $150,000,000, with primary holdings in Ripple,

22

XETA Capital Fund, and Solaris VC Fund. That representation, made during the period in which all Plaintiffs' redemptions had been frozen, simultaneously confirms King's operation of a pooled, multi-entity commodity and securities investment vehicle subject to federal and state registration requirements and contradicts King's contemporaneous representations to individual investors regarding the status, segregation, and accessibility of their accounts.

### F. Pooling, Commingling, and the Unregistered Commodity Pool

66.    Notwithstanding King's representations to Barber regarding segregation, Plaintiffs' funds were in fact pooled and commingled. Moreira's initial $100,000 was sent to King's personal digital wallet and is believed to have been pooled with funds of other investors. The MT5 accounts "mirrored" sub-accounts of a predecessor vehicle, XCF, in which pre-February 2024 investors' funds were held under common management. Compensation events and balance "credits" were applied uniformly across investor accounts following losses, further evidencing pooled management. King personally controlled risk parameters and decision-making for the entire group.

67.    King's December 16, 2024 written admission to Plaintiff Osorio, identifying four separate pooling vehicles (IDFUND, Solaris VC Fund, XETA Capital Fund, and Vortex FX), each with "different management and redemption procedures," constitutes a direct admission that Plaintiffs' capital was pooled across

multiple entities controlled by or affiliated with King for the purposes alleged herein. King's January 28, 2026 representation of a portfolio of investments across twelve (12) companies with an aggregate value exceeding $150 million further confirms operation of a pooled commodity and investment vehicle subject to registration.

68.    The wrongful conduct alleged herein has been continuing in nature with respect to each Defendant, including the Brookline Entities. Discrete acts of concealment, denial of withdrawals, and continued use and benefit of Plaintiffs' pooled capital have occurred through and including the May 13, 2026 synchronized rejection of three of Plaintiff Osorio's withdrawal requests by Vortex FX's automated system within a thirteen-minute period, and continue through the date of filing of this Complaint. Each such overt act independently restarts the statute of limitations as to the conspiracy, aiding-and-abetting, and control-person claims pleaded against the Brookline Entities.

69.    No Defendant was registered with the CFTC or NFA as a commodity pool operator, and no exemption from registration applied. The pooled vehicle was not registered with the United States Securities and Exchange Commission, the Alabama Securities Commission, or the Florida Office of Financial Regulation as a security or commodity pool.

## G. <u>Use of the Brookline Entities</u>

70.    At all relevant times, King acted while affiliated with the Brookline

24

Entities. King is the CEO and an owner of Brookline Group and previously served as a managing director (and, on information and belief, owner) and registered investment adviser representative of Brookline Investments. King used Brookline Entity email infrastructure (including madding@brookline-group email) in material communications with Osorio and others. King copied senior Brookline leadership, including Rainer Twiford, on emails related to the program. Brookline Entity personnel were on notice of King's activities.

71.    King used multiple entities interchangeably (including the Brookline Entities and at least one British Virgin Islands related entity referenced through the "m3bvi.com" email domain) to solicit funds, communicate with investors, and explain losses, without observing corporate formalities or maintaining a clear separation of roles. King exercised unilateral control over funds nominally associated with corporate entities while making personal representations to Plaintiffs about the status and use of those funds. The entities lacked meaningful operational separation from King and from one another.

72.    King's sworn regulatory filings further evidence the use of the corporate form to obscure responsibility. King signed Form D filings with the Securities and Exchange Commission reporting an aggregate of $7.805 million in securities offerings while simultaneously claiming personally to be a passive victim of third parties as to the conduct at issue here.

## VI.  ALTER EGO AND PIERCING THE CORPORATE VEIL

73.    Plaintiffs reallege and incorporate by reference the factual allegations of paragraphs 22 through 72.

74.    The Brookline Entities lacked meaningful independence from King and from one another and were dominated and controlled by King for the purpose of facilitating unlawful conduct. King disregarded corporate formalities, commingled personal and entity funds, and used the entities interchangeably with himself as instrumentalities. The Brookline Entities were operated as a mere instrumentality or alter ego of King. The interests of justice require the disregarding of the Brookline Entities' corporate form. King operated the Brookline Entities for a fraudulent purpose. Adherence to the corporate form under these circumstances would sanction fraud and produce an inequitable result.

75.    Accordingly, King is the alter ego of the Brookline Entities, the Brookline Entities are the alter egos of King and of one another, and each is jointly and severally liable for the obligations of the others arising from the conduct alleged herein.

## VII. CAUSES OF ACTION

### COUNT I
**Unlawful Off-Exchange Retail Commodity and Retail Forex Transactions**
**7 U.S.C. §§ 2(c)(2)(C), 2(c)(2)(D), and 6(b)**
**Private Right of Action under 7 U.S.C. § 25(a)(1)(D)**
**(Plaintiff Moreira against All Defendants)**

76.    Plaintiffs reallege and incorporate by reference the factual allegations of paragraphs 22 through 75.

77.    Section 2(c)(2)(C) of the CEA, 7 U.S.C. § 2(c)(2)(C), governs retail foreign-currency transactions offered to or entered into with persons who are not eligible contract participants on a leveraged or margined basis ("retail forex"). Section 2(c)(2)(D), 7 U.S.C. § 2(c)(2)(D), similarly governs any agreement, contract, or transaction in any commodity that is entered into with, or offered to, a person that is not an eligible contract participant or an eligible commercial entity, on a leveraged or margined basis ("retail commodity transactions"), and applies the enumerated provisions of the CEA to such transactions "as if they were" contracts of sale of a commodity for future delivery.

78.    Plaintiff Moreira is not, and at all times material to this action has not been, an eligible contract participant within the meaning of 7 U.S.C. § 1a(18). The eligible-contract-participant status of Plaintiffs Barber and Osorio is acknowledged in the Parties section above and does not affect the claims of those Plaintiffs in this Complaint, which are brought under 7 U.S.C. § 25(a)(1)(A) and (B) as further set

forth below.

79.   Specifically, at all times material to this action, Plaintiff Moreira had "amounts invested on a discretionary basis" below the $10,000,000 threshold set forth in 7 U.S.C. § 1a(18)(A)(xi)(I), and did not enter into the transactions at issue for hedging or risk-management purposes that would make the $5,000,000 hedging threshold under 7 U.S.C. § 1a(18)(A)(xi)(II) applicable. Moreira's transactions were undertaken for speculative investment purposes and not in connection with the management of any asset owned or liability incurred by him. Moreira does not qualify as an eligible contract participant under any other subpart of 7 U.S.C. § 1a(18), including the categorical eligibility provisions applicable to financial institutions, insurance companies, investment companies, commodity pools, corporations and other business entities meeting specified asset or net-worth tests, governmental entities, broker-dealers, futures commission merchants, floor brokers and traders, or other defined categories.

80.   The leveraged spot gold (XAU/USD) and foreign-exchange contracts for difference offered, solicited, and traded by Defendants through the MetaTrader 5 platform constituted retail commodity transactions within the meaning of 7 U.S.C. § 2(c)(2)(D) and retail forex transactions within the meaning of 7 U.S.C. § 2(c)(2)(C). The transactions did not result in actual delivery within the meaning of 7 U.S.C. § 2(c)(2)(D)(ii)(III)(aa). *See CFTC v. Hunter Wise Commodities, LLC*, 749

F.3d 967 (11th Cir. 2014).

81.    Section 4(b) of the CEA, 7 U.S.C. § 6(b), as applied through 7 U.S.C. §§ 2(c)(2)(C)(vii) and 2(c)(2)(D)(iii), makes it unlawful to offer, enter into, or confirm the execution of any retail forex or retail commodity transaction unless the transaction is conducted on or subject to the rules of a designated contract market or registered foreign board of trade, or unless conducted by a permitted counterparty registered in the applicable capacity (such as a registered futures commission merchant or retail foreign exchange dealer).

82.    Defendants offered, solicited, accepted orders for, intermediated, and otherwise dealt in retail forex and retail commodity transactions that were not conducted on or subject to the rules of any designated contract market, registered foreign board of trade, or permitted counterparty registered with the CFTC or NFA in the requisite capacity. The transactions were instead executed through VortexFX UK, Ltd., a United Kingdom entity not registered in any such capacity in the United States.

83.    Plaintiff Moreira is entitled to maintain a private right of action under 7 U.S.C. § 25(a)(1)(D) because the violations constituted willful violations of the CEA that directly caused injury to Moreira in connection with the placement of orders for, and the trading of, contracts of the type described in 7 U.S.C. § 25(a)(1)(B), including retail forex transactions described in 7 U.S.C. § 2(c)(2)(C)(i) and retail

29

commodity transactions described in 7 U.S.C. § 2(c)(2)(D)(i).

84.    As a direct and proximate result of Defendants' violations, Plaintiff Moreira suffered actual damages in the form of lost principal and lost investment gains.

85.    In addition, and in the alternative as to Plaintiff Moreira, to the extent that the transactions at issue are determined not to constitute "retail commodity transactions" under 7 U.S.C. § 2(c)(2)(D)(i) or "retail forex transactions" under 7 U.S.C. § 2(c)(2)(C)(i), the same conduct gives rise to liability for Moreira under Section 4b of the CEA, 7 U.S.C. § 6b, as pleaded in Count II below. The claims of Plaintiffs Barber and Osorio are brought under 7 U.S.C. § 25(a)(1)(A) and (B) as set forth in Counts II, III, and IV below, and do not depend upon this Count I. Plaintiffs further allege, as to all Plaintiffs and all Defendants, that Defendants' failure to register as Introducing Brokers under 7 U.S.C. § 6d and as Commodity Pool Operators under 7 U.S.C. § 6m(1) constitutes additional underlying violations of the CEA that were directly caused by Defendants' conduct in connection with the transactions at issue, and that those registration violations are pleaded as predicates for the aiding-and-abetting claim in Count IV below. Plaintiffs reserve the right to plead in the alternative under Federal Rule of Civil Procedure 8(d)(2).

**COUNT II**
**CEA Anti-Fraud Violations**
**7 U.S.C. § 6b; Private Right of Action under 7 U.S.C. § 25(a)(1)**
**(All Plaintiffs against All Defendants)**

86.    Plaintiffs reallege and incorporate by reference the factual allegations of paragraphs 22 through 75.

87.    Plaintiffs assert this Count under the private right of action provided by 7 U.S.C. § 25(a)(1)(B), which authorizes a private action for damages against any person, other than a registered entity or registered futures association, who willfully violates any provision of the CEA, by any other person who made through such person any contract of sale of any commodity for future delivery (or option on such contract) or any swap, or who deposited with or paid to such person money, securities, or property (or incurred debt in lieu thereof) in connection with any order to make such contract, option, or swap. Each Plaintiff made transactions through Defendants and deposited money with Defendants in connection with orders to make the transactions at issue, satisfying the requirements of 7 U.S.C. § 25(a)(1)(B). This Count is available to and is asserted by all three Plaintiffs, including Plaintiffs Barber and Osorio whose acknowledged status as eligible contract participants does not affect availability of the private right of action under 7 U.S.C. § 25(a)(1)(B).

88.    Section 4b of the CEA, 7 U.S.C. § 6b, prohibits, in connection with any contract of sale of any commodity in interstate commerce or for future delivery on or subject to the rules of any designated contract market: (i) cheating or defrauding

31

any person; (ii) willfully making or causing to be made any false report or statement; or (iii) willfully deceiving or attempting to deceive any person by any means whatsoever in regard to any order or contract.

89. Defendants made material misrepresentations and omissions to Plaintiffs in connection with leveraged retail commodity transactions, including representations regarding: (i) the segregated nature of Plaintiffs' accounts; (ii) the existence and enforcement of stop-loss and drawdown protections; (iii) King's qualifications and experience; (iv) the legitimacy and exclusivity of the program; (v) the status of Plaintiffs' account balances following loss events; and (vi) Plaintiffs' ability to withdraw funds.

90. Defendants acted with scienter. King's own contemporaneous admissions establish that he knew, or recklessly disregarded, that the risk controls he represented were not being enforced and that Plaintiffs were not being given accurate information regarding the status and accessibility of their funds.

91. Plaintiffs justifiably relied on Defendants' misrepresentations and omissions and suffered actual damages as a proximate result.

92. Defendants' violations of 7 U.S.C. § 6b were willful within the meaning of 7 U.S.C. § 25(a)(1) and directly caused Plaintiffs' injuries. This Count is independent of, and does not depend upon, the characterization of the transactions as "retail commodity transactions" or "retail forex transactions" under 7 U.S.C.

§§ 2(c)(2)(C) or 2(c)(2)(D), and is available to all three Plaintiffs regardless of whether any Plaintiff is an eligible contract participant under 7 U.S.C. § 1a(18).

## COUNT III
### CEA Anti-Fraud Violations as Commodity Trading Adviser
### 7 U.S.C. § 6o; Private Right of Action under 7 U.S.C. § 25(a)(1)
### (All Plaintiffs against All Defendants)

93.   Plaintiffs reallege and incorporate by reference the factual allegations of paragraphs 22 through 75.

94.   Plaintiffs assert this Count under the private rights of action provided by 7 U.S.C. § 25(a)(1)(A) and (B). Subsection (A) authorizes a private action against any person, other than a registered entity or registered futures association, who willfully violates any provision of the CEA, by any other person who received trading advice from such person for a fee. Subsection (B) authorizes a private action by any person who made through such person any contract for future delivery or who deposited money with such person in connection with such an order. Defendants provided trading advice to Plaintiffs in exchange for compensation (whether direct fees, profit-sharing arrangements, or other consideration), and Plaintiffs deposited money with Defendants and made transactions through Defendants in connection with the conduct alleged herein. This Count is asserted by all three Plaintiffs, including Plaintiffs Barber and Osorio whose acknowledged status as eligible contract participants does not affect availability of the private right of action under 7 U.S.C. § 25(a)(1)(A) and (B).

33

95.     Section 4o of the CEA, 7 U.S.C. § 6o(1), prohibits any commodity trading advisor or commodity pool operator, by use of the mails or any means or instrumentality of interstate commerce, from (A) employing any device, scheme, or artifice to defraud any client, participant, or prospective client; or (B) engaging in any transaction, practice, or course of business which operates as a fraud or deceit upon any client, participant, or prospective client.

96.     Defendants acted as commodity trading advisers and commodity pool operators within the meaning of the CEA by, among other things, advising Plaintiffs (and other participants) regarding the value of and advisability of trading in commodity interests, and by soliciting and accepting funds for a pooled investment vehicle that engaged in commodity-interest trading.

97.     Section 4o reaches both commodity trading advisors and commodity pool operators, and its prohibition on fraudulent conduct is not contingent on whether the trading advisor or pool operator was in fact registered with the CFTC. Defendants' operation of an unregistered commodity pool, in which Plaintiffs' funds were pooled and commingled with the funds of other investors and traded on a group basis through the MetaTrader 5 platform via VortexFX and predecessor vehicles (including the Xeta Capital Fund), was conducted by means and instrumentalities of interstate commerce and itself constituted a transaction, practice, and course of business that operated as a fraud and deceit upon Plaintiffs as participants in the pool, in

violation of 7 U.S.C. § 6o(1)(B). The unregistered status of Defendants as commodity pool operators (in violation of 7 U.S.C. § 6m(1)) is alleged herein as a fact bearing on Defendants' status, scienter, and on the unlawful nature of the pooled investment vehicle, and as a predicate for the aiding-and-abetting claim in Count IV below.

98.   By the conduct described herein, Defendants employed devices, schemes, and artifices to defraud Plaintiffs and engaged in transactions, practices, and courses of business that operated as a fraud and deceit upon Plaintiffs.

99.   Plaintiffs suffered actual damages as a direct and proximate result.

## COUNT IV
### Aiding and Abetting Violations of the CEA
### 7 U.S.C. § 25(a)(1) and § 13c(a)
### (All Plaintiffs against All Defendants)

100.   Plaintiffs reallege and incorporate by reference the factual allegations of paragraphs 22 through 75.

101.   Plaintiffs assert this Count under the private right of action provided by 7 U.S.C. § 25(a)(1), which expressly authorizes a private action for damages against any person, other than a registered entity or registered futures association, who willfully aided, abetted, counseled, induced, or procured the commission of a violation of any provision of the CEA, by any person enumerated in subsections (A) through (D) thereof. Each Plaintiff qualifies under at least subsections (A) (having received trading advice from Defendants for compensation) and (B) (having made transactions through Defendants and deposited money with Defendants in connection with

orders to make such transactions). This Count is asserted by all three Plaintiffs and does not depend upon any Plaintiff's status under 7 U.S.C. § 1a(18).

102.   Defendants knowingly aided, abetted, counseled, induced, and procured the CEA violations alleged herein, including the unregistered off-exchange transactions, fraudulent representations, unregistered introducing-broker activity, and operation of an unregistered commodity pool. Each Defendant had knowledge of the violations and substantially assisted in their commission.

103.   The predicate violations of the CEA that Defendants knowingly aided, abetted, counseled, induced, and procured include, without limitation: (i) violations of 7 U.S.C. § 6b (fraud in connection with commodity transactions); (ii) violations of 7 U.S.C. § 6o (fraud by a commodity trading advisor and commodity pool operator); (iii) violations of 7 U.S.C. § 6(b) and §§ 2(c)(2)(C) and 2(c)(2)(D) (offering and entering into off-exchange retail forex and retail commodity transactions outside the framework of a designated contract market or registered foreign board of trade); (iv) violations of 7 U.S.C. § 6d (acting as an introducing broker without registration); and (v) violations of 7 U.S.C. § 6m(1) (operating as a commodity pool operator without registration). Each Defendant had actual knowledge of the violations and provided substantial assistance to their commission, including by soliciting investments, transmitting funds, communicating with investors, collecting Know-Your-Customer documentation, executing trades, managing risk parameters, suppressing

material information, and obstructing redemption demands.

104.   For the avoidance of doubt and pursuant to Federal Rule of Civil Procedure 8(d)(2), Plaintiffs further allege the primary-violator and aider-abettor roles as follows: (i) with respect to the unregistered introducing-broker violations under 7 U.S.C. § 6d, Defendants Brookline Investments, Inc. and Brookline Group, LLC are the primary violators by virtue of their corporate sponsorship and use of corporate infrastructure to intermediate Plaintiffs' transactions, and Defendant King is liable as an aider and abettor by virtue of his role in directing, soliciting, and processing the unregistered intermediary activity; (ii) with respect to the unregistered commodity-pool-operator violations under 7 U.S.C. § 6m(1), Defendant Brookline Group, LLC is the primary violator as the entity whose name and email infrastructure were used to operate the pooled vehicle (including by way of the January 27, 2024 "Ripple Shares Arbitrage Fund" solicitation to Plaintiff Osorio from mking@brookline-group.com), and Defendant King is liable as an aider and abettor; and (iii) with respect to the fraud-based violations under 7 U.S.C. §§ 6b and 6o, Defendant King is the primary violator, and the Brookline Entities are liable as aiders and abettors by virtue of their corporate sponsorship, financial infrastructure, and ratification of King's conduct. The primary-violator and aider-abettor allegations are pleaded in the alternative under Federal Rule of Civil Procedure 8(d)(2).

105.   Plaintiffs suffered actual damages as a direct and proximate result.

**COUNT V**
**Federal Securities Fraud**
**Section 10(b) of the Securities Exchange Act of 1934**
**(15 U.S.C. § 78j(b)) and Rule 10b-5 (17 C.F.R. § 240.10b-5)**
**(All Plaintiffs against All Defendants)**

106.   Plaintiffs reallege and incorporate by reference the factual allegations of paragraphs 22 through 75.

107.   The pooled investment interests offered and sold by Defendants, including interests in the commodity pool described herein, constitute "securities" within the meaning of Section 3(a)(10) of the Securities Exchange Act of 1934, 15 U.S.C. § 78c(a)(10), as investment contracts and otherwise.

108.   In connection with the purchase and sale of those securities, Defendants, directly and indirectly, by use of the means and instrumentalities of interstate commerce and of the mails: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon Plaintiffs.

109.   Defendants acted with scienter, including actual knowledge and recklessness, as detailed herein. Plaintiffs justifiably relied on Defendants' misrepresentations and omissions. The misrepresentations and omissions were material.

Plaintiffs suffered economic loss as a direct and proximate result. Loss causation is established by the abandonment of the represented risk controls, the post-loss balance manipulation, and the denial of withdrawals.

110.   Defendants' scienter is further established by, among other things, Defendant King's contemporaneous written admissions on three specific dates: (a) on October 17, 2024, King admitted in writing that he was "pausing all trading" due to risk-control failures and acknowledged that the represented stop-loss parameters had not been enforced; (b) on November 21, 2024, King admitted in writing that trading had resumed only intermittently and that the represented drawdown and kill-switch protections had been abandoned; and (c) on December 12, 2024, King admitted in writing that there had been "continual complete disregard" of the represented risk parameters by the trader and that account balances had been internally adjusted to conceal the extent of losses. Each admission is a direct contemporaneous statement by the principal Defendant evidencing actual knowledge of, or at minimum reckless disregard for, the falsity of his representations to Plaintiffs regarding risk management, account status, and the integrity of the pooled investment vehicle. These admissions, together with King's December 16, 2024 multi-entity admission and his January 28, 2026 multi-portfolio admission, give rise to a strong inference of scienter sufficient to satisfy the heightened pleading requirements of the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(b)(2).

## COUNT VI
## Florida Securities and Investor Protection Act
## Fla. Stat. §§ 517.301 and 517.211
## (Plaintiffs Osorio and Moreira against All Defendants)

111. Plaintiffs reallege and incorporate by reference the factual allegations of paragraphs 22 through 75.

112. Florida Statutes § 517.301 makes it unlawful for any person, in connection with the rendering of any investment advice or in connection with the offer, sale, or purchase of any investment or security, directly or indirectly: (1) to employ any device, scheme, or artifice to defraud; (2) to obtain money or property by means of any untrue statement of a material fact or any omission of a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading; or (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a person.

113. Florida law treats commodity pools and similar pooled investment vehicles as securities for purposes of Chapter 517. The pooled investment interests offered to Osorio (now a Florida resident) and to Moreira (whose investment was solicited and substantially performed through King's Florida contacts, including the February 18, 2024 meeting in Miami Beach) constitute securities within the meaning of Fla. Stat. § 517.021.

114. Defendants violated § 517.301 by the conduct alleged herein, including the misrepresentations and omissions regarding segregation, risk controls, account

balances, and access to funds.

115.   As to Plaintiff Osorio specifically, the conduct giving rise to liability under Fla. Stat. § 517.301 includes solicitations directed into the State of Florida from May 2023 forward, including: (a) the November 7 and November 19, 2023 representations regarding XETA Capital Fund continuity and a represented 20% monthly accrual rate; (b) the January 27, 2024 solicitation from mking@brookline-group.com regarding a purported "Ripple Shares Arbitrage Fund"; (c) the February 22, 2024 fee-structure representation regarding a 50-50 profit split with the trader; (d) the December 16, 2024 multi-entity refusal email; (e) the October 29, 2025 "principal protected" representation by Daniel Kingsley; and (f) the May 13, 2026 synchronized denial of three separate withdrawal requests by Vortex FX's automated system within a thirteen-minute period. Each of those communications was received by Osorio in his capacity as a Florida resident, supports the application of Florida law to his claims, and was made in connection with the offer, sale, or maintenance of investment interests treated as securities under Florida law.

116.   As to Plaintiff Moreira specifically, the conduct giving rise to liability under Fla. Stat. § 517.301 includes solicitations and meetings directed to and conducted within the State of Florida, including: (a) the February 18, 2024 in-person meeting between King and Moreira at The Continuum, a luxury residential property in Miami Beach, Florida, which King represented to be his "second home" and

which served as the site of substantive in-person discussion of the trading program and Moreira's continued investment; (b) communications from King to Moreira through the madding@m3bvi.com and reporting@m3bvi.com email addresses, including monthly performance reports and account statements referencing Florida-based holdings and operations; (c) post-loss communications from King directed to Moreira regarding the abandonment of represented risk controls and the multi-entity restructuring, which were received by Moreira at his Florida contact addresses; and (d) Moreira's subsequent communications with Daniel Kingsley and Vortex FX personnel from Florida. Each of those contacts establishes a sufficient nexus to the State of Florida for the application of Florida law to Moreira's claims under the Florida Securities and Investor Protection Act.

117.   Pursuant to Fla. Stat. § 517.211, Plaintiffs Osorio and Moreira are entitled to recover the consideration paid for the securities, plus interest, together with reasonable attorneys' fees and costs, less the amount of any income received on the securities, upon tender of the securities (or, in the alternative, actual damages caused by the violation).

**COUNT VII**
**Fraudulent Inducement / Intentional Misrepresentation**
**Ala. Code § 6-5-101**
**(All Plaintiffs against All Defendants)**

118.   Plaintiffs reallege and incorporate by reference the factual allegations of paragraphs 22 through 75.

119. Defendants made material misrepresentations of existing fact to Plaintiffs, including but not limited to representations regarding account segregation; the existence and enforcement of stop-loss and drawdown protections; King's qualifications and experience; the legitimacy and regulatory status of the program; the existence and recoverability of "credited" balances; and Plaintiffs' ability to access and withdraw their funds.

120. The representations were made willfully, recklessly, or with knowledge of their falsity. Plaintiffs justifiably relied on the representations and would not have invested or maintained their investments in the absence of the representations. Plaintiffs suffered damages as a proximate result.

121. Pursuant to Ala. Code § 6-11-20, Plaintiffs are entitled to punitive damages because Defendants' conduct was characterized by gross, reckless, or intentional misconduct.

## COUNT VIII
### Fraudulent Suppression
### Ala. Code § 6-5-102
### (All Plaintiffs against All Defendants)

122. Plaintiffs reallege and incorporate by reference the factual allegations of paragraphs 22 through 75.

123. Defendants had a duty to disclose material facts to Plaintiffs by virtue of: (i) the partial disclosures they made, which created a duty to disclose all material facts; (ii) the fiduciary and confidential relationship between Plaintiffs and

Defendants, who exercised exclusive control over Plaintiffs' funds and accounts; and (iii) the parties' unequal access to material information.

124. Defendants suppressed material facts they had a duty to disclose, including: (i) the unregistered status of King and the Brookline Entities under the CEA; (ii) the abandonment and override of the represented stop-loss and drawdown protections; (iii) the commingling and pooled treatment of Plaintiffs' funds; (iv) the true status of Plaintiffs' "credited" balances and the conditions on withdrawals; and (v) the regulatory issues at the offshore liquidity provider level.

125. Plaintiffs relied on the suppression in continuing their participation in the program and in declining to take protective steps earlier. Plaintiffs were damaged as a proximate result.

## COUNT IX
### Breach of Fiduciary Duty
### (All Plaintiffs against All Defendants)

126. Plaintiffs reallege and incorporate by reference of paragraphs 22 through 75.

127. Defendants owed fiduciary duties to Plaintiffs by virtue of the relationship of trust and confidence created by King's position as the sole intermediary and decision maker with respect to Plaintiffs' funds; King's personal receipt of funds into wallets he controlled; the maintenance of MT5 accounts under King's control and, in Moreira's case, in King's name; King's exercise of discretionary risk-

management authority over Plaintiffs' accounts; and King's representations as a managing principal of the Brookline Entities.

128. Defendants breached those duties by, among other things: (i) abandoning the represented risk controls without disclosure or consent; (ii) commingling Plaintiffs' funds; (iii) misrepresenting account balances and access to funds; (iv) failing to supervise the trader and broker; and (v) refusing to permit withdrawals.

129. Plaintiffs suffered damages as a direct and proximate result and are entitled to compensatory damages, disgorgement, and punitive damages.

## COUNT X
### Conversion
### (All Plaintiffs against All Defendants)

130. Plaintiffs reallege and incorporate by reference the factual allegations of paragraphs 22 through 75.

131. Plaintiffs had, and continue to have, a possessory and ownership interest in their invested principal and any associated balances. Defendants intentionally exercised dominion and control over those funds in a manner inconsistent with Plaintiffs' rights, including by refusing to permit withdrawals, conditioning withdrawals on group-level recoupment, and continuing to use the funds for purposes other than for Plaintiffs' benefit. Plaintiffs demanded return of their funds and were refused.

132. Plaintiffs have been damaged in the amount of their invested principal and any associated balances and are entitled to compensatory and punitive damages.

## COUNT XI
## Civil Conspiracy
## (All Plaintiffs against All Defendants)

133. Plaintiffs reallege and incorporate by reference the factual allegations of paragraphs 22 through 75.

134. Defendants agreed and acted in concert with one another, and with non-parties Daniel Kingsley and VortexFX UK, Ltd., to accomplish the unlawful purposes alleged herein, including the unregistered solicitation of leveraged retail commodity transactions; the operation of an unregistered commodity pool; the making of material misrepresentations and omissions; and the post-loss manipulation of account balances and denial of withdrawals.

135. Defendants performed overt acts in furtherance of the conspiracy. Plaintiffs suffered damages as a proximate result and are entitled to compensatory and punitive damages.

## COUNT XII
## Unjust Enrichment / Restitution
## (All Plaintiffs against All Defendants)

136. Plaintiffs reallege and incorporate by reference the factual allegations of paragraphs 22 through 75.

137. Defendants received and retained the benefit of Plaintiffs' funds, fees, and commissions earned or derived from the program. It would be inequitable and unconscionable for Defendants to retain those benefits under the circumstances

46

alleged. Plaintiffs are entitled to restitution and disgorgement of all such benefits.

**COUNT XIII**
**Sale of Unregistered Securities**
**Ala. Code § 8-6-4; Private Right of Action under Ala. Code § 8-6-19**
**(All Plaintiffs against All Defendants)**

138.   Plaintiffs reallege and incorporate by reference the factual allegations of paragraphs 22 through 75.

139.   Alabama Code § 8-6-4 makes it unlawful for any person to offer or sell any security in this state unless (a) it is registered under the Alabama Securities Act, (b) the security or transaction is exempted under Alabama Code § 8-6-10 or § 8-6-11, or (c) it is a federal covered security for which all required notice filings and fees have been made.

140.   The interests offered and sold by Defendants to Plaintiffs in the leveraged retail commodity trading program and related pooled investment vehicles (including, without limitation, interests in the XETA Capital Fund, the Solaris VC Fund, the IDFUND/Ripple investment vehicle, and the Brookline Group "Ripple Shares Arbitrage Fund") constituted "securities" within the meaning of Alabama Code § 8-6-2(10), including as investment contracts under the Howey test, in that Plaintiffs invested money in a common enterprise with the expectation of profits to be derived solely or substantially from the efforts of King and the other Defendants.

141.   Defendants offered and sold those securities in or from the State of Alabama. King, the Brookline Entities, and the related vehicles operated from

Alabama; the solicitations and communications with Plaintiff Barber (an Alabama citizen) and with Plaintiff Osorio during his Alabama residency emanated from Alabama; and the securities were not registered under the Alabama Securities Act, not exempted under Alabama Code §§ 8-6-10 or 8-6-11, and not federal covered securities for which the required notice filings and fees were made.

142. Pursuant to Alabama Code § 8-6-19(a)(1), any person who offers or sells a security in violation of § 8-6-4 is liable to the purchaser. Plaintiffs hereby tender their securities (or, with respect to securities they no longer own, the equivalent thereof) and seek recovery of the consideration paid for the securities, together with interest at the legal rate of six percent (6%) per annum from the date of payment, costs, and reasonable attorneys' fees, less the amount of any income received on the securities, as provided by Alabama Code § 8-6-19(a)(1).

143. In the alternative, if Plaintiffs no longer own the securities, they seek damages in the amount of the consideration paid for the securities, together with interest at the legal rate of six percent (6%) per annum from the date of payment, costs, and reasonable attorneys' fees, less the value of the securities at the time the Plaintiff disposed of them and less any income received on the securities, as provided by Alabama Code § 8-6-19(a)(1).

**COUNT XIV**
**Securities Fraud**
**Ala. Code § 8-6-17; Private Right of Action under Ala. Code § 8-6-19**
**(All Plaintiffs against All Defendants)**

144.    Plaintiffs reallege and incorporate by reference the factual allegations of paragraphs 22 through 75.

145.    Alabama Code § 8-6-17 makes it unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly, to: (1) employ any device, scheme, or artifice to defraud; (2) make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or (3) engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

146.    In connection with the offer and sale of the securities described in Count XIII, Defendants made material misrepresentations and omissions to Plaintiffs, including without limitation those previously alleged in this Complaint with respect to: (a) the segregated nature of Plaintiffs' accounts; (b) the existence and enforcement of stop-loss, drawdown, and kill-switch protections; (c) King's qualifications and experience, including representations of prior experience as a trader on the Chicago Mercantile Exchange; (d) the legitimacy, exclusivity, and historical profitability of the program; (e) the registration status of Defendants and the regulatory framework applicable to the investments; (f) the status of Plaintiffs' account

49

balances following the loss events of April 2024 and September 2024; (g) the represented continuity and accrual rate of the XETA Capital Fund as communicated to Osorio on November 7 and November 19, 2023; (h) the represented "principal protected" status of client accounts as communicated by Daniel Kingsley on October 29, 2025; (i) the represented imminence of redemptions as communicated by Daniel Kingsley on February 2, 2026; and (j) Plaintiffs' ability to withdraw funds.

147.   Defendants also suppressed material facts that they had a duty to disclose, including: the unregistered status of Defendants and of the securities offered; the multi-entity structure used to deploy and segregate Plaintiffs' capital, as later admitted in King's December 16, 2024 email to Osorio; the offshore registration of Vortex FX in Saint Lucia (registration No. 2023-00517); the financial arrangements between King and the Brookline Entities on the one hand and Vortex FX and Kingsley on the other; the actual scope and history of drawdowns experienced by the trading strategy; the removal of represented risk-limit controls; and Defendants' intent to use the multi-entity structure as a barrier to redemption.

148.   The misrepresentations, omissions, and suppressed facts were material in that a reasonable investor would have considered them important in deciding whether to invest, to remain invested, or to commit additional capital. Plaintiffs justifiably relied on the misrepresentations and on the omissions, and would not have invested or would have withdrawn their investments sooner had the true facts been

disclosed.

149. Defendants acted with the requisite scienter, as established by, among other things, King's contemporaneous written admissions detailing his knowledge of the failures and abandonments of the represented risk parameters, the trader's departures from the represented strategy, and the use of the multi-entity structure to defeat redemption requests.

150. Pursuant to Alabama Code § 8-6-19(a)(2), Plaintiffs are entitled to recover the consideration paid for the securities, together with interest at the legal rate of six percent (6%) per annum from the date of payment, costs, and reasonable attorneys' fees, less the amount of any income received on the securities. In the alternative, if Plaintiffs no longer own the securities, Plaintiffs seek damages calculated under Alabama Code § 8-6-19(a)(2).

**COUNT XV**
**Control-Person Liability Under the Alabama Securities Act**
**Ala. Code § 8-6-19(c); Private Right of Action under Ala. Code § 8-6-19**
**(All Plaintiffs against All Defendants)**

151. Plaintiffs reallege and incorporate by reference the factual allegations of paragraphs 22 through 75.

152. Alabama Code § 8-6-19(c) provides that every person who directly or indirectly controls a seller liable under § 8-6-19(a), and every partner, officer, or director (or person occupying a similar status or performing similar functions) of such a seller, every employee of such a seller who materially aids in the sale, and

every broker-dealer or agent who materially aids in the sale, is jointly and severally liable with and to the same extent as the seller, unless the non-seller defendant sustains the burden of proof that he or she did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist.

153.   Defendant King, as the managing member, chief executive officer, owner, and registered investment adviser representative associated with the Brookline Entities, and as the primary solicitor and intermediary in connection with the offer and sale of the securities at issue, directly and indirectly controlled the Brookline Entities and the issuance, offer, and sale of the securities in question. King is jointly and severally liable as a control person under Alabama Code § 8-6-19(c) for the violations alleged in Counts XIII and XIV.

154.   Defendant Brookline Group, LLC, as the entity whose corporate identity, infrastructure, and email systems were used by King in connection with the offer and sale of the securities (including the Brookline Group "Ripple Shares Arbitrage Fund" solicitation to Plaintiff Osorio on or about January 27, 2024), is jointly and severally liable as a control person and as a material aider under Alabama Code § 8-6-19(c) for the violations alleged in Counts XIII and XIV.

155.   Defendant Brookline Investments, Inc., through which King operated as a managing director and registered investment adviser representative, and whose

Chief Financial Officer Sarah Beth Cain processed the May 31, 2023 Solaris VC wire from Plaintiff Osorio, is jointly and severally liable as a control person and as a material aider under Alabama Code § 8-6-19(c) for the violations alleged in Counts XIII and XIV.

156.    Plaintiffs are entitled to the same remedies against the control-person Defendants as are available against the primary violators under Counts XIII and XIV, including recovery of the consideration paid for the securities, interest at the legal rate, costs, and reasonable attorneys' fees, pursuant to Alabama Code § 8-6-19(a) and (c).

## VIII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, jointly and severally, and award the following relief:

(a)    Compensatory damages in an amount to be proven at trial, including but not limited to the return of Plaintiffs' invested principal of not less than $3,643,000 and lost investment gains;

(b)    Punitive damages pursuant to Ala. Code § 6-11-20 and applicable law;

(c)    Rescission and disgorgement of all benefits unjustly retained by Defendants, including the consideration paid by Plaintiffs Osorio and Moreira pursuant to Fla. Stat. § 517.211, and the consideration paid by all Plaintiffs pursuant to Ala.

53

Code § 8-6-19;

(d)    Pre-judgment and post-judgment interest at the maximum rate permitted by law, including interest at the legal rate of six percent (6%) per annum on the consideration paid by Plaintiffs pursuant to Ala. Code § 8-6-19;

(e)    Attorneys' fees and costs pursuant to Fla. Stat. § 517.211, Ala. Code § 8-6-19(a) and (c), and other applicable law;

(f)    Equitable relief, including an accounting; the imposition of a constructive trust over Plaintiffs' funds and any traceable proceeds; and an order preserving Defendants' assets, including but not limited to the digital wallets and MetaTrader accounts identified herein, pending resolution of this action; and

(g)    Such other and further relief as the Court deems just and proper.

Respectfully submitted,

/s/ Braden M. Perry
BRADEN M. PERRY
*(Pro Hac Vice Forthcoming)*

**OF COUNSEL:**
KENNYHERTZ PERRY, LLC
2000 Shawnee Mission Pkwy, Ste. 325
Mission Woods, KS 66205
Telephone: (816) 527-9447
braden@kennyhertzperry.com

/s/ William G. Somerville
WILLIAM G. SOMERVILLE
JADE E. SIPES

**OF COUNSEL:**
BAKER, DONELSON, BEARMAN,
   CALDWELL & BERKOWITZ, P.C.
1901 Sixth Avenue North, Ste. 2600

54

Birmingham, Alabama 35203
Telephone: (205) 328-0480
wsomerville@bakerdonelson.com
jsipes@bakerdonelson.com

*Counsel for Plaintiffs Robert Barber, Jose Osorio, and Andre Moreira*