FILED
2026 Nov-06 PM 01:32
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

ROBERT BARBER, JOSE OSORIO, and ANDRE MOREIRA,

Plaintiffs,

v.

MADDING KING, BROOKLINE INVESTMENTS, INC., and BROOKLINE GROUP, LLC,

Defendants.

Case No. 2:26-cv-01170-MHH

**JURY TRIAL DEMANDED**

## FIRST AMENDED COMPLAINT

Plaintiffs Robert Barber ("Barber"), Jose Osorio ("Osorio"), and Andre Moreira ("Moreira") (collectively, "Plaintiffs") bring this First Amended Complaint against Defendants Madding King ("King"), Brookline Investments, Inc. ("Brookline Investments"), and Brookline Group, LLC ("Brookline Group"; and together with Brookline Investments, the "Brookline Entities"; and collectively with King, "Defendants"), and in support allege as follows:

## I. NATURE OF THE ACTION

1. This action arises from a coordinated fraudulent scheme by which King, acting individually and through the Brookline Entities, solicited and misappropriated not less than $3,500,000 in principal invested by Plaintiffs in a purported leveraged spot gold and foreign-exchange trading program operated through an unregistered

offshore platform, and in related pooled investment vehicles managed by Brookline Investments.

2. The investments were marketed to Plaintiffs as safe, risk-managed, and operated under disciplined, pre-agreed risk controls. In fact, Plaintiffs' funds were pooled across multiple undisclosed entities, deployed in off-exchange leveraged retail commodity transactions through an unregistered offshore trading platform, exposed to risk parameters that had been secretly abandoned, and ultimately subjected to concealment, denial of withdrawals, and continuing misuse.

3. King functioned as the sole intermediary for all three Plaintiffs. He controlled solicitation, onboarding, funding, communications, risk representations, and all post-loss explanations. He operated through the Brookline Entities and their corporate email infrastructure. King used his Brookline Group email address (mking@brookline-group.com) in communications with Plaintiff Osorio about the subject matter of this action and in the November 3, 2023 Google Meet invitation sent to Plaintiff Moreira that initiated the Moreira solicitation.

4. Plaintiffs seek rescission and restitution of their invested principal, compensatory damages for lost investment gains, punitive damages, pre-judgment and post-judgment interest, attorneys' fees and costs under applicable statutes, and equitable relief including an accounting and the preservation of Defendants' assets.

## II. JURISDICTION AND VENUE

5. This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331 because the action arises under the laws of the United States, including the Commodity Exchange Act, 7 U.S.C. §§ 1 *et seq.*, and the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a *et seq.*

6. This Court has subject-matter jurisdiction over Plaintiffs' private rights of action under the Commodity Exchange Act pursuant to 7 U.S.C. § 25(c), which vests the United States District Courts with exclusive jurisdiction over such actions.

7. This Court has supplemental jurisdiction over the state-law claims pursuant to 28 U.S.C. § 1367(a) because those claims form part of the same case or controversy as the federal claims and arise from a common nucleus of operative fact.

8. Venue is proper in this District under 7 U.S.C. § 25(c) and 28 U.S.C. § 1391(b). Defendants reside in or transact business in this District, and a substantial part of the acts and omissions giving rise to Plaintiffs' claims occurred in this District.

9. King is the current registered agent in Alabama for approximately twenty Alabama companies. Under Alabama Code § 10A-1-5.31(b)(2)(A), registered agents must be Alabama residents, and the forms King has signed and filed with the Alabama Secretary of State are signed under penalty of perjury.

10. On July 23, 2025, King signed and filed with the United States

Securities and Exchange Commission a Form D - Notice of Exempt Offering of Securities reporting total sales of $3,385,000 and listing himself as a “Related Person” at a Birmingham, Alabama address.

11. On September 26, 2025, King signed and filed with the United States Securities and Exchange Commission a further Form D - Notice of Exempt Offering of Securities reporting total sales of $4,420,000 and again listing himself as a “Related Person” at a Birmingham, Alabama address.

12. Brookline Investments is an Alabama corporation with its principal place of business in Jefferson County, Alabama. Brookline Group is an Alabama limited liability company with its principal place of business in Jefferson County, Alabama.

13. This Court has personal jurisdiction over King based on his Alabama residency, his sworn representations of residency to the Alabama Secretary of State and the Securities and Exchange Commission, and his purposeful direction of the solicitation, communications, and account-setup activity at issue toward Plaintiffs Barber and Osorio in Alabama, and toward Plaintiff Moreira in Florida. This Court has personal jurisdiction over Brookline Investments and Brookline Group as Alabama corporate entities with their principal places of business in Alabama.

## **III. PARTIES**

14. Plaintiff Robert Barber is, and at all times material to this action has

been, a resident and citizen of Jefferson County, Alabama.

15. Plaintiff Jose Osorio was, at the time of the acts and omissions giving rise to this action, a resident of Jefferson County, Alabama. Osorio is now a resident and citizen of the State of Florida.

16. Plaintiff Andre Moreira is a citizen of the Federative Republic of Brazil. During the period material to this action, Moreira had substantial in-person and electronic contact with King acting as a representative of Brookline Group, LLC, and personal contact with King in Florida, including a personal meeting at The Continuum, a luxury residential property in Miami Beach, Florida that King represented was his second home, on February 18, 2024.

17. For the avoidance of doubt, Plaintiffs Barber and Osorio acknowledge that at the times material to the transactions giving rise to this action, they had amounts invested on a discretionary basis sufficient to qualify as eligible contract participants under 7 U.S.C. § 1a(18)(A)(xi)(I). Plaintiff Moreira is not, and at all times material to this action has not been, an eligible contract participant within the meaning of 7 U.S.C. § 1a(18). The eligible-contract-participant status of Barber and Osorio does not affect the claims of those Plaintiffs, which are brought under 7 U.S.C. § 25(a)(1)(A) and (B) as set forth in Counts II, III, and IV below.

18. Defendant Madding King is an individual who, through his sworn regulatory filings and public holdings-out, is a resident of the State of Alabama. King

is the managing member, chief executive officer, and owner of Brookline Group. At times material to this action, King was Managing Director of Brookline Financial Partners, Inc., the parent of Brookline Investments, and an Investment Advisory Representative of Brookline Investments, as represented in the Confidential Offering Materials for Solaris VC, LLC that Brookline Investments furnished to Plaintiff Osorio in May 2023. King's known direct telephone line is 205.834.3128. King operates and has operated multiple email identities in connection with the conduct alleged herein, including madding@m3bvi.com, madding.king@gmail.com, mking@brookline-group.com, madding@solaris-vc.com, mking@idfund.co, and reporting@m3bvi.com.

19. Defendant Brookline Investments, Inc. is an Alabama corporation with its principal place of business at 2830 Cahaba Road, Suite 100, Birmingham, Jefferson County, Alabama. According to its own offering materials, Brookline Investments is registered with the United States Securities and Exchange Commission as an investment adviser, is a wholly owned subsidiary of Brookline Financial Partners, Inc., a Delaware corporation, and is wholly owned, through that parent, by J. Rainer Twiford, who serves as its President and Chief Executive Officer. Brookline Investments serves as the Manager and Investment Adviser of Solaris VC, LLC, a pooled investment vehicle in which Plaintiff Osorio invested. Sarah Beth Cain is the Chief Financial Officer of Brookline Investments.

20. Defendant Brookline Group, LLC is an Alabama limited liability company with its principal place of business in Jefferson County, Alabama. King's Brookline Group email correspondence represents that securities are offered through Castle Hill Capital Partners, Inc., a broker dealer registered with the Securities and Exchange Commission and a member of FINRA and SIPC.

21. Non-parties Brookline Financial Partners, Inc. and Castle Hill Capital Partners, Inc. are not named as Defendants in this action. Plaintiffs expressly reserve the right to amend to add them following further discovery.

22. Non-party Daniel Kingsley is believed to be a resident of the United Kingdom and served as the trader for the investment program at issue. His known email address is d.kingsley@vortexfx.com and his known UK freephone number is 0800 058 4532. Non-party VortexFX UK, Ltd. is believed to be a United Kingdom entity, or in the alternative a Saint Lucia entity (registration No. 2023-00517) as represented by Kingsley to clients and investors on or about October 29, 2025. Kingsley and VortexFX UK are not named as Defendants in this action; Plaintiffs expressly reserve the right to amend to add them following further jurisdictional and conflict-of-laws analysis and further discovery.

## IV. TOLLING AGREEMENT AND LIMITATIONS PRESERVATION

23. On or about January 30, 2026, each Plaintiff entered into a written Tolling Agreement with King. Pursuant to those Tolling Agreements, all applicable

periods of limitation, whether contractual, statutory, or equitable, for the filing of any civil action arising from or in any way connected with claims against King are tolled from the Effective Date (January 30, 2026) through the Expiration Date (July 30, 2026), or such later date as the parties may agree in writing or as may follow from any party's sixty days' notice of termination.

24. The Tolling Agreements bind King personally. The Tolling Agreements do not bind the Brookline Entities, which are not parties to the Tolling Agreements.

25. With respect to Plaintiffs' claims against the Brookline Entities, the discovery rule, the continuing-violations doctrine, and the doctrine of equitable tolling each independently preserve all claims asserted herein. No Plaintiff had a reasonable basis to distinguish the institutional participation of the Brookline Entities from the personal conduct of King, or to discover that his invested capital had been pooled and routed through multiple undisclosed vehicles, before the loss events of 2024 and the post-loss communications described in Section IX below. Plaintiff Osorio first had notice of the multi-entity structure on or about December 16, 2024, when King responded in writing to Osorio's formal withdrawal demand by refusing the demand on "wrong entity" grounds and identifying separate undisclosed vehicles, including "XCF," distinct from the Vortex FX platform. Plaintiff Barber first came to suspect that his funds had been pooled rather than held

in a segregated account when he began questioning King about the program's structure after the 2024 loss events, and received direct confirmation of pooling from the trader Kingsley in a subsequent conversation. Plaintiff Moreira first had notice of the multi-entity structure through King's post-loss communications in 2024, including King's April 3, 2024 clarification email, King's August 29, 2024 message regarding Moreira's "XCF balance," and King's November 11, 2024 messages describing the credited balances as "borrowed capital." In each case, the applicable discovery date falls within the two years preceding the filing of the original Complaint on July 7, 2026.

26. The wrongful conduct alleged herein has been continuing in nature with respect to each Defendant, including the Brookline Entities. Discrete acts of concealment, denial of withdrawals, and continued use and benefit of Plaintiffs' pooled capital have occurred through and including the date of filing of this First Amended Complaint.

## V. COMMON FACTUAL ALLEGATIONS

### *A. The Trading Program and Its Structure*

27. At all times material to this action, Defendants solicited investments into a purported leveraged spot gold (XAU/USD) and foreign-exchange contract-for-difference (CFD) trading program (the "Program"). The Program was executed through the MetaTrader 5 (MT5) software platform, with trades routed through

Vortex FX, an offshore trading platform.

28. The Program's trading involved leveraged or margined positions in XAU/USD and foreign-currency pairs. XAU/USD transactions constitute leveraged commodity trading subject to the Commodity Exchange Act. The transactions were offered to retail customers off any registered contract market and were not executed on, or subject to the rules of, any designated contract market, registered foreign board of trade, or registered futures commission merchant in the United States.

29. At no time material to this action was King registered with the Commodity Futures Trading Commission (CFTC) or the National Futures Association (NFA) in any capacity, including as an introducing broker, commodity pool operator, commodity trading adviser, or associated person. At no time material to this action were Brookline Investments or Brookline Group registered with the CFTC or NFA in any capacity. At no time material to this action was Vortex FX registered with the CFTC or NFA as a retail foreign exchange dealer, retail commodity merchant, or in any capacity authorized to deal in retail commodity transactions with United States persons.

30. Plaintiffs did not interact directly with any registered futures commission merchant, registered introducing broker, registered commodity pool operator, registered commodity trading adviser, or any registered securities broker-dealer at any time during the solicitation, onboarding, funding, or management of

their investments. All such interactions were with or through King.

### *B. King's Role as Sole Intermediary*

31. King was the sole point of contact for each Plaintiff with respect to the Program. King personally solicited each Plaintiff's investment, personally directed each Plaintiff through the account-setup process, personally provided each Plaintiff with the wallet address or wiring instructions used to fund the Program, personally received and collected each Plaintiff's Know-Your-Customer documentation, and personally communicated all information to each Plaintiff regarding the Program's purported performance, risk management, and post-loss events.

32. King held himself out to Plaintiffs as a financially sophisticated individual with prior trading experience at the Chicago Mercantile Exchange. In an April 8, 2024 mass email to investors, King stated: "As many of you know, I was a trader at the CME in Chicago for 10 years early in my career."

33. King provided cryptocurrency deposit addresses to each funding Plaintiff. For Plaintiff Barber, King provided deposit address 0x6fbd24f2143e0e93ba7d93edb218e0f3bf1e4cb1. For Plaintiff Moreira, King provided several different wallet addresses at different times, including King's personal wallet 0x2F9CfE2b9dD28AF1DB6f04a8B2aA726678d44B8c, which was used to receive Moreira's November 17, 2023 and January 31, 2024 transfers, and additional wallet addresses 0x981B3f1Ec319C84BfA65246Ebf58Cd5663C4DB71

and 0x02844Adbc309Aa3ae0959eDf2C388Edbd87CEe1c for subsequent Moreira transfers.

34. King acted at all material times as the de facto decision-maker over Plaintiffs' funds. He controlled the Program's risk parameters as communicated to Plaintiffs, authorized trading-strategy changes, controlled the "crediting" of losses, and controlled whether and when Plaintiffs could withdraw their funds.

### *C. The Brookline Entities' Role*

35. King operated the Program through, and with the resources of, the Brookline Entities. King was at all material times the managing member, chief executive officer, and owner of Brookline Group, and had been a managing director and investment adviser representative associated with Brookline Investments.

36. King used the Brookline Group email domain (brookline-group.com) in solicitations and communications bearing directly on the Program. The November 3, 2023 Google Meet invitation sent by King to Plaintiff Moreira to initiate the Moreira solicitation was sent from mking@brookline-group.com. The November 16, 2023 second Google Meet with Moreira, at which King provided final funding instructions, was also set up from mking@brookline-group.com. During the November 3, 2023 meeting, after the connection briefly dropped, King re-contacted Moreira by email using the Brookline Group account; the email signature identified King as a representative of Brookline Group, LLC, and provided King's direct line

as 205.834.3128.

37. Brookline Investments is the Manager and Investment Adviser of Solaris VC, LLC, a Series LLC pooled investment vehicle, as stated in the Confidential Offering Materials for Solaris VC, LLC (Series A). Those materials identify Brookline Investments as an SEC-registered investment adviser, identify King as an Investment Advisory Representative of Brookline Investments and as Managing Director of its parent, and designate King as the Manager's authorized representative for subscription inquiries at madding@solaris-vc.com. On May 3, 2023, Sarah Beth Cain, Chief Financial Officer of Brookline Investments, sent those offering materials and the Solaris VC wire instructions to Plaintiff Osorio from sbcain@brooklineinvestments.com, stating that King had asked her to send "our documents for Solaris VC." Cain administered Osorio's subscription, resent the subscription paperwork and wire instructions on May 31, 2023, and on June 1, 2023 confirmed receipt of Osorio's $25,000 wire in writing. King, at mking@idfund.co, was copied on that correspondence throughout.

38. On January 25, 2024, Rainer Twiford, President and Chief Executive Officer of Brookline Investments, signed a letter to investors on Brookline Investments letterhead proposing a "Ripple Share Arbitrage Fund" and directing interested investors to contact King at MKing@brookline-group.com or Twiford at rtwiford@brooklineinvestments.com. On January 27, 2024, King forwarded

Twiford's letter to Plaintiff Osorio from mking@brookline-group.com, with a Brookline Group, LLC signature block stating that securities are offered through Castle Hill Capital Partners, Inc., a registered broker-dealer. Osorio replied the same day that he was interested, and on February 17, 2024 King responded that the fund had documents and that King would walk Osorio through the offering by phone.

39. At relevant times, King sent at least one email to Plaintiff Osorio reporting daily returns on which Rainer Twiford was copied as a recipient.

40. The Brookline Entities furnished the corporate sponsorship, the SEC-registered investment-adviser status, the email infrastructure, the subscription and wire-transfer administration, and the corporate holding-out that enabled King to present the Program and its related pooled vehicles to Plaintiffs as the institutional offering of a legitimate, regulated investment-advisory business, rather than as the personal activity of King alone.

***D. Vortex FX and Non-Party Kingsley***

41. Vortex FX is a non-United States trading platform through which the Program's trades were purportedly executed. Non-party Daniel Kingsley served as the trader for the Program (referred to in King's communications as "Dan") and controlled the trading activity executed through Vortex FX. On August 15, 2024, Kingsley sent a direct communication to Program investors, including Plaintiffs, identifying himself as a "Partner" at Vortex FX. In June 2024, King traveled to

London and met Kingsley in person.

42. Vortex FX was not registered with the CFTC or NFA as a retail foreign exchange dealer or in any capacity authorized to deal in retail commodity transactions with United States persons, and was not a designated contract market or a permitted counterparty for retail commodity transactions under the Commodity Exchange Act.

## VI. ALLEGATIONS SPECIFIC TO PLAINTIFF BARBER

43. Barber was first introduced to the Program in 2023 through Plaintiff Osorio, who was then an acquaintance and who had reported returns to Barber on his own investment with King.

44. Barber initially declined an introduction to King and chose to monitor the Program's reported performance before considering an investment.

45. The introductory email that arranged Barber's first conversation with King was sent from a Brookline email address and identified King as affiliated with Brookline. Before the call, Barber researched King on the basis of that Brookline affiliation, including by confirming that King held an active broker registration at the time and by searching court records for litigation or criminal matters involving King. Barber found nothing adverse. Barber's willingness to take the call, and his subsequent willingness to invest, rested in part on King's apparent status as a registered professional affiliated with an established Alabama investment-advisory

business.

46. On August 3, 2023, a conference call took place among Barber, King, and Osorio to discuss a potential investment by Barber.

47. During the August 3, 2023 conference call, Barber raised two specific objections directly with King. First, Barber told King he was not comfortable with a pooled, non-segregated account structure, and that he wanted an individual account from which he could withdraw his funds at any time. Second, Barber told King he was not comfortable with the Program's trading strategy because of concerns regarding risk management.

48. In response, King told Barber on the August 3, 2023 call that he understood Barber's concerns and was working on measures to address both: to provide investors with individual accounts and to implement a better risk-management system with multiple strategies and multiple risk profiles. King also represented to Barber on that call that King had worked for ten years as a trader.

49. Through the remainder of 2023, Osorio kept Barber informed of the Program's reported progress toward addressing Barber's two concerns. In early 2024, Osorio told Barber that the Program had moved to individual accounts.

50. On March 12, 2024, Barber sent King a text message to arrange a call. On that call, King represented to Barber that the Program was now set up with individual accounts, that stop losses and other safeguards were in place, and that

with those controls Barber's account would not be subject to a catastrophic loss. King again referenced his ten years of experience as a trader. King also told Barber that the trader had not favored the move to individual accounts.

51. Barber's decision to invest was predicated on his reasonable reliance on King's March 12, 2024 representations that (a) his funds would be held in a segregated, individual account, and (b) his investment would be protected by a disciplined risk-control system, each of which King had first undertaken to provide in the August 3, 2023 call.

52. On March 13, 2024, King emailed Barber requesting a public blockchain address, a copy of his driver's license, and proof of address. Barber provided his MetaMask address (0x351b87142D38cB42dbca115812c9f287eB9Ff9bc) and the requested documents the same morning.

53. On March 14, 2024, King emailed Barber MetaTrader 5 download instructions, directing Barber to select "Vortex FX Ltd." as the broker. Later that day, King provided Barber with the specific deposit address 0x6fbd24f2143e0e93ba7d93edb218e0f3bf1e4cb1 and advised Barber to send a smaller test amount first. When Barber asked whether he was to send USDC to the MetaTrader 5 account, King confirmed: "Yes. USDC. ETH chain."

54. On March 15, 2024, Barber sent a $25 USDC test deposit to the deposit

address King had provided. King emailed Barber that day: "Haha. I forgot to tell the trader you were sending in a test amount. He texted me, 'not much I can do with $25.'"

55. Between March 15, 2024 and April 4, 2024, Barber transferred USDC to the deposit address King had provided in four transfers totaling approximately $990,478.44, fully funding his investment on April 4, 2024.

56. Despite King's representation that Barber's funds would be held in a segregated, individual account with independent risk controls, Barber's funds were deposited through a wallet address controlled by King rather than directly with any trading venue, and were thereafter traded, exposed to risk, and subjected to losses on a pooled basis with the funds of other Program investors. The same trading algorithm, the same liquidity-provider errors, and the same stop-outs affected Barber's account and the accounts of other investors simultaneously, as reflected in King's June 26, 2024 email reporting six specific Vortex accounts stopped out together by a single liquidity-provider error and King's October 3, 2024 email reporting the 50% stop-out across accounts. Despite King's representation that Barber's investment would be protected by stop losses and other safeguards, the Program's pre-agreed risk parameters, including the kill-switch and stop-loss protocols, were abandoned, overridden, or never implemented as to Barber's account, as further alleged below.

57. Barber did not learn, and could not reasonably have discovered, that his invested capital had been pooled with the funds of other investors and routed through multiple undisclosed entities (including Brookline Investments and Brookline Group) until after the 2024 loss events, when he began questioning King about the Program's structure and came to suspect that his account was not segregated, and received direct confirmation of pooling from the trader Kingsley in a subsequent conversation. Prior to that time, Barber understood his investment to be held in a segregated trading account at MetaTrader 5 / Vortex FX, as King had represented.

58. Following the loss events alleged below, King represented to Barber that his account would be "credited" back to its original starting balance, and Barber's MetaTrader account thereafter displayed a balance of approximately $990,000. Despite that displayed balance and despite Barber's repeated demands, neither King nor the trader has permitted Barber to withdraw any portion of it. On information and belief, the displayed balance was a notational entry unsupported by any actual funds held for Barber's benefit, which is why the funds cannot be transferred out. Barber's principal investment of approximately $990,478.44 remains frozen and inaccessible.

## VII. ALLEGATIONS SPECIFIC TO PLAINTIFF OSORIO

59. Osorio was an earlier investor with King than either Barber or Moreira, and was the person who introduced both Barber and Moreira to King. Osorio's

investments with King included early-stage venture investments and, beginning in 2023, investments in pooled vehicles and in the Program.

### *A. The Solaris VC, LLC Investment Through Brookline Investments (May-June 2023)*

60. On May 3, 2023, Sarah Beth Cain, Chief Financial Officer of Brookline Investments, emailed Osorio from sbcain@brooklineinvestments.com, stating that King had asked her to send Osorio "our documents for Solaris VC," and attaching the Confidential Offering Materials for Solaris VC, LLC (Series A) and the Solaris VC wire instructions. Cain stated she would send subscription documents for electronic signature separately and requested a copy of Osorio's driver's license.

61. The Confidential Offering Materials identified Brookline Investments as the Manager and Investment Adviser of Solaris VC, LLC; identified Brookline Investments as an SEC-registered investment adviser; identified King as an Investment Advisory Representative of Brookline Investments and as Managing Director of its parent, Brookline Financial Partners, Inc.; and identified J. Rainer Twiford as the owner, President, and Chief Executive Officer of that parent. The Subscription Agreement directed all questions regarding the offering to "the Manager's authorized representative Madding King, III" at madding@solaris-vc.com.

62. On May 31, 2023, Osorio emailed Cain and King (at mking@idfund.co) that he would make the wire transfer that day and requested the

subscription paperwork by Docusign. Cain resent the paperwork and wire instructions the same morning. Osorio initiated a wire of $25,000 to Solaris VC, LLC at ServisFirst Bank, Birmingham, Alabama, in accordance with the wire instructions Cain had provided. After a brief hold by Osorio's bank, Cain confirmed receipt of the wire in writing on June 1, 2023. Osorio was a resident of Alabama at the time of the Solaris VC investment.

### *B. Relocation to Florida (June 2023)*

63. In June 2023, Osorio relocated his residence from Alabama to Florida. Each of Osorio's subsequent investments with King described below was made while Osorio was a resident of Florida.

### *C. The XETA / Vortex Investments by USDC Transfer (October-November 2023)*

64. Before Osorio invested in the Program, King engaged Osorio in extensive discussions regarding the Program's trading, its trading bots, and its models. King represented to Osorio, repeatedly, that trading would be conducted by algorithm only, and the parties discussed and agreed upon a maximum drawdown limit that would govern the trading. King further represented to Osorio that, upon transfer of Osorio's capital to the Vortex platform, Osorio would be able to begin withdrawals.

65. In reliance on those representations, Osorio made three USDC transfers from his cryptocurrency exchange wallet

(0x3896407FA793D1Fc5209caCBF8069bC1a2b9F5A5) to King's personal digital wallet (0x2F9CfE2b9dD28AF1DB6f04a8B2aA726678d44B8c), the same wallet to which King directed Moreira's first two transfers. Each is independently verifiable on the public Ethereum blockchain: (a) on October 26, 2023, 99,410.46 USDC, transaction hash 0x832d39c3ba619ad87180b5b8acb6824ca7769a03449443b7b280fbeb1029fe5a; (b) on October 31, 2023, 497,231.38 USDC, transaction hash 0x8f266646c89caa31589b229c271a2c43e97539ed0cd8bf76b9e1131600ac4680; and (c) on November 20, 2023, 397,776.15 USDC, transaction hash 0xfdf1fdfc737491ccc11451c9f3c54ccf36897dc30b8991f5b2a55013d43ab071. The three transfers total 994,417.99 USDC.

66. Osorio made additional smaller USDC transfers to King in the same period totaling approximately $100,000. Osorio's total investment in the Program through USDC transfers was approximately $1,100,000, and his total principal invested with King across all vehicles was approximately $1,250,000.

### *D. The Ripple Share Arbitrage Fund Solicitation Through Brookline (January-February 2024)*

67. On January 27, 2024, King forwarded to Osorio, from mking@brookline-group.com, a January 25, 2024 letter signed by Rainer Twiford on Brookline Investments letterhead proposing a "Ripple Share Arbitrage Fund" and directing interested investors to King at MKing@brookline-group.com or to Twiford

at rtwiford@brooklineinvestments.com. King's forwarding email bore a Brookline Group, LLC signature block stating that securities are offered through Castle Hill Capital Partners, Inc., a registered broker-dealer and member of FINRA and SIPC. Osorio replied the same day that he was interested. On February 17, 2024, King wrote that the fund had documents and that he would walk Osorio through the offering by phone, adding that he also wanted to discuss "Dan Jr (the new trader)."

### *E. Vortex Accounts, Reported Balances, and Withdrawal Demands*

68. Osorio maintained two Vortex accounts, numbers 295029 and 295252. The reported balance of each account reached approximately $8,000,000 by February 2024, for a combined reported balance exceeding $16,000,000.

69. Osorio began requesting withdrawals from King while his capital was still on the XETA platform, before the migration to Vortex. In early January 2024, Osorio submitted a withdrawal request for $2,000,000 at a time when the reported balance had surpassed $5,000,000. That request was not honored. Throughout 2024, Osorio spoke with King by telephone approximately weekly and on each such call requested withdrawal of at least his principal. Those requests were not honored.

70. In late February 2024, Osorio's accounts were wiped out by trading that, as King later acknowledged in writing, had not been conducted by algorithm and had not respected the agreed maximum drawdown. Approximately one week later, the accounts were "credited" to their prior balances. Osorio immediately

requested withdrawal and was told to wait until the trading desk had recouped some of the credited funds. After the reported balance again crossed $8,000,000, Osorio again requested withdrawal multiple times. Those requests were not honored and led to Osorio's December 15, 2024 written demand to Kevin Hall described below.

71. King communicated with Osorio throughout the investment and management period using multiple email identities, including madding@m3bvi.com, madding@solaris-vc.com, mking@brookline-group.com, mking@idfund.co, madding.king@gmail.com, and reporting@m3bvi.com.

72. On December 15, 2024, Osorio sent a formal written withdrawal demand to Kevin Hall, Chief Executive Officer of Vortex FX, seeking immediate processing of the $2,000,000 withdrawal request. Osorio's letter detailed that his account had reached a peak of approximately $8 million by February 2024 before being wiped out by trading that failed to adhere to the agreed-upon maximum drawdown limits of 30 to 40 percent.

73. On December 16, 2024, King replied to Osorio's withdrawal demand in writing. King's complete reply stated:

> It's still just poking on the wrong entity. Jan and Feb, you had no Vortex account. Kevin Hall has zero responsibility for XCF. Dan maybe for being a dumbass, but not Vortex proper.

74. King's December 16, 2024 reply was Osorio's first notice that King was treating Osorio's capital as having been deployed through multiple distinct

entities (including a separate "XCF" vehicle different from Vortex FX) with separate persons responsible for separate aspects of the deployment, rather than through the single Vortex FX trading relationship King had previously represented to Osorio. Throughout the period following the losses, King responded to Osorio's withdrawal demands with a succession of explanations attributing responsibility to the trader or to Vortex personnel rather than to King or the Brookline Entities.

75. Osorio's funds remain frozen and inaccessible. Osorio has not been permitted to withdraw any of his funds despite repeated demand.

## VIII. ALLEGATIONS SPECIFIC TO PLAINTIFF MOREIRA

### *A. Introduction and First Google Meet (November 2023)*

76. In early November 2023, Moreira was introduced to King by Osorio, a mutual acquaintance. Osorio told Moreira that he had invested $1,000,000 with King and was receiving a monthly return of approximately 20%, that King worked at an asset-management firm, and that King had invested approximately $3,000,000 of his own savings in the Program and was withdrawing significant sums.

77. On November 3, 2023, King sent Moreira an invitation for a Google Meet conversation. The invitation was sent from mking@brookline-group.com, the Brookline Group corporate email address.

78. During the November 3, 2023 Google Meet, King represented to Moreira: (a) that the investment involved trading gold (mainly) and currency pairs;

(b) that King was the intermediary responsible for defining strategies and managing the trading robots; and (c) that King had prior trading experience at the Chicago Mercantile Exchange.

79. When the Google Meet connection briefly dropped during the November 3, 2023 conversation, King re-contacted Moreira by email from his Brookline Group address so that the conversation could continue. The email signature identified King as a representative of Brookline Group, LLC, and provided King's direct telephone line as 205.834.3128. The Google Meet was then reinstated.

80. Based on King's representations in the November 3, 2023 Google Meet, Moreira decided to make an initial investment of $90,000. King instructed Moreira to (i) buy USDC stablecoins through his personal cryptocurrency exchange; (ii) create a MetaMask wallet account; (iii) transfer the USDC from the cryptocurrency exchange into the newly created MetaMask account; and (iv) transfer USDC directly into King's personal digital wallet, rather than to any Vortex FX or other institutional address.

***B. Second Google Meet (November 16, 2023) and First Transfer (November 17, 2023)***

81. On November 16, 2023, King set up a second Google Meet with Moreira, again from the mking@brookline-group.com address. During the November 16, 2023 meeting, King provided Moreira with final funding instructions.

82. On November 17, 2023, Moreira made his first investment of $90,000.

The transfer went from Moreira's MetaMask wallet (0x329aFdeF9c513c13481c40915BA7AaBa883c32D1) to King's personal wallet (0x2F9CfE2b9dD28AF1DB6f04a8B2aA726678d44B8c). The transaction hash is 0x1ff9a215267bd03adc331f02d31d215b9996aa574d6c9b7a20718ed57e304ee9. The net amount received by King was 89,997.47 USDC. The transfer is independently verifiable on the public Ethereum blockchain.

### *C. XETA Representations and Daily "Growth" Reports (November 2023 - January 2024)*

83. On November 19, 2023, King sent a mass email to undisclosed Program recipients representing that XETA was closing to new investors and reducing returns to 5% per month, un-compounded, paid quarterly, equivalent to a 15% quarterly dividend. King represented in that email that the XETA changes "doesn't affect us in any ways" and that "we will still have the ability to add to and withdraw from accounts" and that accounts "will continue to accrue at the current 20% cap per month rate." King further represented that he would "be getting a direct API feed from the broker to the accounts and distributing the balances and returns on an anticipated daily basis via email" and that the new arrangement "puts me in a position of much better oversight and active participation with the team."

84. On December 9, 2023, King sent a further mass email describing a trading strategy he represented had been "meticulously developed" over "five years of research," with a "protective buffer" risk-management feature; King represented

that none of the maximum drawdown levels had been hit in the preceding 36 months and dedicated one-third of the email to describing the Program's purported "reliable risk management" tools.

85. On January 6, 2024, King sent a mass email representing that he had been unresponsive the prior week because he was on "a family ski trip to Vail" and that he was "working closely with the trader on moving us OUT of XETA Capital and into our own environment" within "the next few weeks if not sooner." King further represented that he had formed "an offshore entity that will have direct ownership and custody" which he was calling "M3 Ventures."

86. On January 9, 2024, King sent a mass email with an attached spreadsheet purporting to show the balances of dozens of investor accounts in the Program, with the largest reported balance being 11,769,429.19 USDC.

87. On January 19, 2024, King sent a mass email with the subject line "quick tease" representing that the first account had been migrated to "the new platform" and showing a total account balance of 6,486,717.33 USDC. King represented that the new custodian would be "FXCM, based in the UK and regulated by their FCA" and "owned by Jefferies (JEF:NYSE)," which King characterized as "a substantial upgrade."

88. On January 25, 2024, King sent a mass email stating that the Program was "building software that will email you your balances daily" and that the reports

would come from reporting@m3bvi.com.

89. On January 27, 2024, Moreira received his first automated report from reporting@m3bvi.com, stating that his November 17, 2023 investment had nearly doubled to 183,426.58 USDC.

90. On January 29, 2024, Moreira received a further automated report from reporting@m3bvi.com showing a balance of 185,983.75 USDC, a reported gain of 1.39% in two days. On January 30, 2024, a further report showed 188,502.19 USDC, a reported gain of 1.35% in one day. On January 31, 2024, a further report showed 190,828.91 USDC, a reported gain of 1.23% in one day.

### *D. Second Transfer (January 31, 2024)*

91. Motivated by the automated growth reports from reporting@m3bvi.com, Moreira made a second investment of $100,000 on January 31, 2024. The transfer went from Moreira's cryptocurrency exchange wallet (0xb8bA36E591FAceE901FfD3d5D82dF491551AD7eF) to King's personal wallet (0x2F9CfE2b9dD28AF1DB6f04a8B2aA726678d44B8c). The transaction hash is 0x9714dde0972042ed9e5e547bcda92cbbaf6b4909860ff4766f1c37919432c3b3. The net amount received by King was 99,991.35 USDC.

### *E. MT5 Account Access and Third and Fourth Transfers (February 2024)*

92. On February 1, 2024, Moreira received an automated report from reporting@m3bvi.com showing a balance of 193,088.80 USDC.

93. On February 4, 2024, King sent a mass email representing that investors would receive login credentials to access MetaTrader 5 accounts within 24 to 48 hours and that investors would "be able to see real-time balances and actual trading" through the MT5 app.

94. On February 5, 2024, Moreira received a further automated report from reporting@m3bvi.com showing a balance of 300,689.70 USDC. Moreira also received login credentials for MetaTrader Account 294883; he subsequently received login credentials for a second MetaTrader Account, 294923.

95. On February 6, 2024, Moreira made a third investment of $200,000. The transfer went from Moreira's cryptocurrency exchange wallet (0xb8bA36E591FAceE901FfD3d5D82dF491551AD7eF) to a different King-controlled wallet (0x981B3f1Ec319C84BfA65246Ebf58Cd5663C4DB71). The transaction hash is 0x38705ac01e1bac14c6a49b24df5fc7616b096c33dcdcf735c9785bef12d28e3c. The net amount received by King was 199,994.39 USDC.

96. On February 9, 2024, Moreira made a fourth investment of $101,000. The transfer went from Moreira's MetaMask wallet (0x329aFdeF9c513c13481c40915BA7AaBa883c32D1) to the same King-controlled wallet (0x981B3f1Ec319C84BfA65246Ebf58Cd5663C4DB71). The transaction hash is

0x0634ec9378806be411c930206d1429192793240fbe74ec99ea4fe4a5a9491af5. The net amount received by King was 100,985.46 USDC.

### *F. Miami Beach Meeting (February 18, 2024) and Fifth and Sixth Transfers*

97. On February 18, 2024, Moreira met King in person for lunch at The Patio, a restaurant at The Continuum, a luxury residential property in Miami Beach, Florida, which King represented to Moreira was his second home. The Patio holds itself out as available to Continuum residents only. Moreira was accompanied by his twelve-year-old son. Plaintiff Osorio was also present at the lunch and paid the bill. Moreira had traveled to Florida with his son on February 10, 2024, stayed in Miami on February 18 and 19, 2024, and departed Florida on February 19, 2024.

98. During the Miami Beach lunch, King made the following specific representations to Moreira. King warned Moreira about the risk of mistakenly sending cryptocurrency to the wrong digital address and, by way of illustration, showed Moreira on King's phone what King represented as a $500,000 cryptocurrency investment that King said he had "buried" by sending it to a wrong digital address with a single incorrect letter in the wallet address; King treated the lost $500,000 as a "no problem" matter for himself. King showed Moreira a MetaTrader application on his phone that purportedly displayed a balance of approximately $31,000,000 from the trading strategy in which Moreira was investing. King represented that he had already withdrawn significant profits from

the Program. King described the Program as an exclusive investment "club." King complained that another investor's daughters had kept asking too many questions regarding the strategy and that this had bothered him. King described himself as a seasoned and successful trader with a long history in the financial markets. King stated that the Program was nearing its investment cap.

99. In direct reliance on King's representations made at the February 18, 2024 Miami Beach lunch, Moreira committed an additional $1,000,000 to the Program by the end of February 2024, representing approximately one-third of his family's net worth.

100. On February 21, 2024, Moreira made a fifth investment of $500,000. The transfer went from Moreira's MetaMask wallet (0x329aFdeF9c513c13481c40915BA7AaBa883c32D1) to a different King-controlled wallet (0x02844Adbc309Aa3ae0959eDf2C388Edbd87CEe1c). The transaction hash is 0xaa24e46a78069894f10b0cfabc92ffcd3f88a6d51eb51fb0a4f8858a2f578658. The net amount received by King was 499,928.00 USDC.

101. On February 22, 2024, King sent a mass email representing that from that moment forward the profit of the trades would be split 50/50 between investors and the trader, which King characterized as a better rate than those previously charged in prior deals "through Brookline Investments Solaris Fund and Xeta

Capital Fund," and as "a lot more transparent."

102. On February 27, 2024, Moreira made a sixth and final investment of $500,000. The transfer went from Moreira's MetaMask wallet (0x329aFdeF9c513c13481c40915BA7AaBa883c32D1) to the same King-controlled wallet (0x02844Adbc309Aa3ae0959eDf2C388Edbd87CEe1c). The transaction hash is 0xa2c987dab801570cf3792f4b9330a3b6ba592d2da0bd57a089906209e970ab9a. The net amount received by King was 499,996.00 USDC.

***G. Account Ownership and Peak Reported Value***

103. Moreira's larger MetaTrader account, Account 294923, was titled in King's name ("MaddingKing") as the listed account owner, not in Moreira's name, and was configured at 500-to-1 leverage, as reflected in screenshots of the Vortex MetaTrader 5 interface. Moreira's second MetaTrader account, Account 294883, bore no account-holder name. Neither account was titled in Moreira's name.

104. Moreira's total principal committed, net of transfer fees, was 1,490,892.67 USDC. At the end of February 2024, Moreira's two MetaTrader accounts showed a reported balance of over $5,000,000. King attributed the reported gains to "upgrades made to the trading robots."

***H. March 2024 Loss and King's Admission of Moreira's Non-UHNW Status***

105. On March 1, 2024, King sent a mass email acknowledging "significant

errors in the bot trading accounts today" and representing that the Program was "placing outsized trades" that had closed out a number of accounts. King represented that he had offered his personal account to help cover losses, but that the trader had declined King's offer because the Program had "a sizable account for this type of event."

106. Later on March 1, 2024, King sent a further mass email purporting to quote the trader as stating that "anyone who's lost will be compensated," that the Program had "a fund just allocated for screw ups like this," and that the trader's "risk management team opened a lot of hedges against our total account" that had "offset a lot of what clients see as losses anyway."

107. On March 10, 2024, King forwarded to investors an email from support@vortexfx.com representing that Vortex FX's practice was "designed primarily for Ultra High Net Worth Clients" and that Vortex FX considered a "substantial success" to be a "consistent monthly return" of 5-10%.

108. On March 11, 2024, Moreira sent King an email asking to stop investing and stating that he was not an ultra-high-net-worth individual and had "made a bet of 1/3 of all my family assets." In response, King asked for Moreira's account numbers and total amount invested. Moreira replied with Accounts 294923 and 294883 and the total investment of $1.5 million. King replied that the trader had to work out the open positions and that King would cover any loss of principal risk

until then. On March 12, 2024, Moreira agreed to continue trading, and King replied that "it's hard to watch" the real-time trades. As of March 12, 2024, King had actual knowledge that Moreira was not an ultra-high-net-worth individual and that Moreira had invested one-third of his family's assets in the Program.

### *I. Florida Nexus (Moreira)*

109. King's solicitation and management of Moreira's investment had substantial contacts with the State of Florida. Moreira was physically present in Florida from February 10 through February 19, 2024, during which period he made the fourth of his six transfers (February 9, 2024, initiated from Florida the day before his arrival) and attended the February 18, 2024 lunch at The Patio at The Continuum in Miami Beach at which King made the representations described above; Moreira made the fifth and sixth transfers (February 21 and February 27, 2024) in direct reliance on those Miami Beach representations. King's email communications to Moreira were sent from mking@brookline-group.com (November 3 and 4, 2023), from madding@solaris-vc.com (November 19, 2023 through January 19, 2024, with madding.king@gmail.com copied on January 19, 2024), and from madding@m3bvi.com and reporting@m3bvi.com (January 25, 2024 onward). From March 21, 2024 through December 19, 2025, King and Moreira communicated frequently by WhatsApp using King's Birmingham, Alabama telephone number, 205.834.3128.

### *J. Discovery of Pooling and Multi-Entity Structure (Moreira)*

110. Moreira did not learn, and could not reasonably have discovered, that his invested capital had been pooled with the funds of other investors and routed through multiple undisclosed entities (including Brookline Investments and Brookline Group) until King's post-loss communications in 2024, including King's April 3, 2024 clarification email describing the XCF sub-account mirroring structure, King's August 29, 2024 message to Moreira regarding Moreira's "XCF balance," and King's November 11, 2024 messages to Moreira stating that the credited balances across investor accounts were "borrowed capital" that Vortex had placed "off balance sheet" and that Moreira's account was "not just a credit applied like a lot of the accounts." Prior to those communications, Moreira understood his investment to be held in trading accounts at MetaTrader 5 / Vortex FX, as King had represented.

111. Despite repeated demand, including a written demand on October 1, 2025 to which King responded that he had "no control" over Moreira's assets and that Moreira had "sent them directly to Vortex" (a statement contradicted by the blockchain record showing every Moreira transfer went to a wallet King had designated and controlled), Moreira has not been permitted to withdraw his funds. Other than a $25 test payment Vortex sent to a Moreira wallet address on December 19, 2025, no portion of Moreira's $1,490,892.67 principal investment has been

returned.

## IX. LOSS EVENTS, BROKEN RISK CONTROLS, AND KING'S ADMISSIONS

112. From the time Plaintiffs' funds were deployed in the Program, they were subjected to a series of catastrophic losses driven by trading that departed from the Program's represented risk controls, by the systemic failure or override of promised safeguards, and by the undisclosed abandonment of the specific risk parameters that King had represented to Plaintiffs would be enforced. The admissions summarized below are drawn from King's own written communications to Program investors and are quoted or closely paraphrased from those communications.

113. On April 1, 2024 at approximately 5:59 p.m., King sent a mass email with the subject "Quick Update" acknowledging a trading error, stating that the trading desk would absorb the error and that accounts would be rolled back to value at close on Wednesday the 27th, that withdrawal requests were being suspended until May, and that risk would be adjusted dramatically.

114. On April 2, 2024 at approximately 6:33 a.m., King forwarded to investors a letter from the "Vortex FX Team." The Vortex FX letter stated that "[p]er our agreement with your account manager, we established a 50% drawdown kill switch for all accounts," and that "we made a deviation from this protocol based on our confidence in the corrective potential of the XAU/USD trend." The letter stated

that withdrawal requests would be temporarily suspended and reviewed at the end of a four-week period, and that the suspension was necessary to utilize compensation to bolster company capital and expedite the recovery process.

115. On April 3, 2024 at approximately 3:56 p.m., King sent a mass email in which King admitted: "I have obviously been speaking with Dan quite a bit about his break in discipline" and "As a bit of a mea culpa, I broke discipline as well." King further represented that in the future the Program "will require monthly withdrawals until a full return of principal has been reached." In a 5:29 p.m. clarification email the same day, King explained the XETA/Vortex structure: pre-February 2024 investor capital had been sent to "XCF (Xeta Capital Fund)," with the MT5 account mirroring a sub-account at XCF; post-February 2024 investors opened accounts directly at Vortex; King had opened new Vortex accounts for all XCF investors that morning.

116. On April 8, 2024 at approximately 7:05 a.m., King sent a mass email in which he stated: "As many of you know, I was a trader at the CME in Chicago for 10 years early in my career." King represented the gold market as unprecedented, stating: "I have NEVER seen anything quite like this." King represented that the strategy was "up somewhere near 58% for March" before the pullback.

117. On April 23, 2024 at approximately 6:24 a.m., King sent a mass email with the subject "Drawdown." King stated: "We hit the 30% stops yesterday

morning and spoke directly with the trader"; that the trader "outlined a very detailed plan of attack, and I approved an additional drawdown amount"; and that "[i]n hindsight, it was not a very helpful decision." King further stated that the Program was "continuing to have issues with proper sizing."

118. On April 29, 2024, King forwarded a letter from Vortex FX stating that its standard approach "typically doesn't heavily rely on stop-loss orders or 'kill switches,'" that "Vortex FX will recoup these compensations through our performance fee structure," and that "[u]nfortunately, the anticipated correction did not materialise, leading us into a cycle of chasing losses." The letter also identified for the first time Daniel Kingsley as a Partner at Vortex FX, at the email address d.kingsley@vortexfx.com.

119. On June 15, 2024, King sent a mass email reporting that he had met the trader (Kingsley) in person in London, that King was "very impressed," and that the Program was abandoning its XETA migration strategy because of AML/KYC issues at the XETA fund liquidation level, which King summarized by stating: "Apparently, banks frown on anonymous crypto-related transactions."

120. On June 26, 2024 at approximately 5:38 p.m., King sent a mass email reporting that six specific Vortex accounts had been stopped out (294860, 295069, 295050, 295070, 295102, and 295029). King stated: "THIS WAS AN LP ERROR, NOT a strategy or Vortex-related error. Long story short, the LP used an incorrect

symbol, effectively magnifying trade size 5x since we resumed trading." King also admitted that drawdowns were "not adjusted daily" but "set at the beginning of the month," acknowledging: "I was under the impression it was a daily event, but since we had not tested the theory until today, I did not know to ask for clarification."

121. On August 15, 2024, King forwarded a direct communication from Daniel Kingsley, identifying himself as a Partner at Vortex FX, to Program investors including Plaintiffs. Kingsley represented that Vortex FX had "compensated clients with substantial 'company capital'" and asked for "patience as we continue to recoup our initial compensation." Kingsley further represented that clients were "free to make new deposits into sub-accounts with different risk settings," which would "allow[] you to withdraw your principal investment freely from non-compensated accounts."

122. On October 3, 2024 at approximately 5:48 p.m., King sent a mass email with the subject "Today" in which he admitted: "The 30% stop limit was removed as the additional long hedges would have triggered it almost immediately (I was unaware of this at the time)." King explained in that email that a EUR short position ahead of the September 18, 2024 Fed meeting had led to manual hedges; the market had turned; the strategy had created further long positions that drew down; and the 50% stop out had been hit. King represented that accounts would be credited back for the difference between the 50% hard stop out and the previous 30% limit. The

unilateral and undisclosed removal of the 30% stop limit was a direct departure from the risk-management representations King had made to Barber, Osorio, and Moreira to induce their investments.

123. On October 17, 2024 at approximately 8:25 a.m., King sent a mass email with the subject "Assessment" in which he stated: "We have endured pretty much the worst case scenario I could have possibly envisioned with back to back significant losses." King stated: "I am pausing all trading." King further stated: "This current strategy is certainly not a good fit for the existing market."

124. On October 28, 2024, King sent a mass email representing that trading had been "temporarily suspended" until "likely after the election," and that the Program was continuing to attempt liquidation of XCF funds held at the Liquidity Provider in the UAE through a branch of a UAE royal family office. King acknowledged in that email: "I fully expect to stick my foot in my mouth on this."

125. On November 21, 2024, King sent a mass email stating that trading had resumed intermittently with adjusted strategies but had been taken offline because "[t]he algo did not recognize an open position, and we had to close them manually. I am not ok with that." King further stated that "Xeta is still a quagmire" and that "[w]e are aggressively upping the legal and regulatory pressure on the brokers themselves," because, King represented, the brokers "were making around $3 to $5 million a month on the entire Xeta Capital pool, so they haven't had any motivation

to cooperate."

126. On November 11, 2024, in WhatsApp messages to Moreira, King stated that Vortex had "credited your account back in excess of $5mm" and that Vortex "would like the ability to make some of that back via their profit share." King then stated: "The issue is that they came off balance sheet for the comp backs. So basically it's borrowed capital." King added that Moreira's situation differed because Moreira "had a large deposit and it's not just a credit applied like a lot of the accounts." These statements constitute King's admission that the balances displayed in investor accounts following the 2024 loss events, including Barber's and Osorio's, were notational credits funded by the trading platform rather than by investor capital.

127. On February 11, 2025, in WhatsApp messages to Moreira, King stated that Moreira had "a pretty large credit outstanding," that the matter had been "temporarily shelved" while King dealt with XETA, and that "Dan and his partner came out of pocket 25mm, so they'd like to make that back."

128. On October 1, 2025 and again on October 10, 2025, in WhatsApp messages responding to a written demand for return of Moreira's principal, King stated that he had "no control over your assets" and that Moreira had "sent them directly to Vortex." Those statements were false. Each of Moreira's six transfers was sent to a wallet address King personally designated and controlled, including King's

personal wallet 0x2F9CfE2b9dD28AF1DB6f04a8B2aA726678d44B8c, not to Vortex. In the same exchange, King stated that he was "still pursuing the Xeta assets in Swiss court."

129. On December 12, 2024, King sent a mass email with the subject "Accounts and liquidation" in which he admitted: "With the continual complete disregard of everything I have been trying to implement over the past two months, I have forbidden trading in the accounts." King stated that trading was forbidden "until, at the very least, the XCF accounts are liquidated and/or the full initial principal is returned." King further stated: "I apologize for this disaster and will do everything in my power to get this resolved."

130. On December 16, 2024, King replied in writing to Plaintiff Osorio's December 15, 2024 formal withdrawal demand to Kevin Hall at Vortex FX. King's complete reply stated: "It's still just poking on the wrong entity. Jan and Feb, you had no Vortex account. Kevin Hall has zero responsibility for XCF. Dan maybe for being a dumbass, but not Vortex proper." The reply was Osorio's first notice that King was treating Osorio's capital as deployed through multiple distinct entities with separate persons responsible for separate aspects of the deployment, and placed Plaintiffs on notice of the multi-entity structure King was using to deflect responsibility and refuse redemption.

131. Each of King's written admissions in April, June, August, October,

November, and December 2024, standing alone and in combination, is direct contemporaneous evidence of King's actual knowledge of, or at minimum reckless disregard for, the falsity of his pre-investment representations to Plaintiffs regarding risk management, segregation, strategy discipline, and the integrity of the Program.

132. At no time after Plaintiffs' funds were deployed in the Program did Defendants permit any Plaintiff to withdraw his principal, his purported investment gains, or any amount reflected on his MetaTrader account statement. Each Plaintiff's funds remain frozen and inaccessible.

## X. POOLING, COMMINGLING, AND THE UNREGISTERED COMMODITY POOL

133. Despite King's pre-investment representation to Barber that Barber's funds would be held in a segregated, individual account, and despite the uniform appearance to Plaintiffs that each investment was held in a separate MetaTrader account, Plaintiffs' funds were in fact pooled with the funds of other investors and routed through multiple undisclosed vehicles.

134. The multi-entity routing included, among other vehicles, the Xeta Capital Fund (XCF), to which pre-February 2024 investor capital was sent and in which investor MetaTrader accounts mirrored sub-accounts (as King admitted in his April 3, 2024 clarification email), and Vortex FX, which King described in his December 16, 2024 reply to Osorio as a separate entity from XCF with a different person responsible. The structure also involved King's personal digital wallets,

including 0x2F9CfE2b9dD28AF1DB6f04a8B2aA726678d44B8c, 0x981B3f1Ec319C84BfA65246Ebf58Cd5663C4DB71, and 0x02844Adbc309Aa3ae0959eDf2C388Edbd87CEe1c, which King used at various times to receive Moreira's investor capital rather than any Vortex FX or other institutional address.

135. King's February 22, 2024 mass email identified additional pooled vehicles by referring to "prior deals through Brookline Investments Solaris Fund and Xeta Capital Fund," confirming the use of the Brookline Investments corporate infrastructure in prior pooled investment vehicles related to the Program.

136. On information and belief, additional undisclosed vehicles were involved in the pooling and routing of Plaintiffs' funds, and additional vehicles will be identified through discovery.

137. The Program as operated constituted a commodity pool within the meaning of 7 U.S.C. § 1a(10), because the Program accepted funds from multiple participants for the purpose of trading in commodity interests.

138. No Defendant was registered as a commodity pool operator with the CFTC or NFA at any time material to this action, in violation of 7 U.S.C. § 6m(1).

## XI. ALTER EGO AND VEIL PIERCING

139. King treated the Brookline Entities as mere instrumentalities of his personal business. King operated the Program using the Brookline Entities' email

infrastructure and corporate names, directed Plaintiffs' investment funds through the Brookline Entities' wire and corporate facilities, and used the Brookline Entities' corporate holdings-out to lend the appearance of institutional legitimacy to the Program. The Brookline Entities, in turn, permitted and ratified King's use of their corporate infrastructure and benefited from Plaintiffs' investments.

140. King exercised complete domination and control over the finances, policy, and business practices of Brookline Group as its managing member, chief executive officer, and sole or principal owner. King exercised equivalent influence over the Program-related activities of Brookline Investments through his position as a managing director and investment adviser representative. Decision-making authority over the Program, including which solicitations to make, which email identity (mking@brookline-group.com, mking@idfund.co, madding@m3bvi.com, madding@solaris-vc.com, madding.king@gmail.com, or reporting@m3bvi.com) to use in each communication, which Brookline-affiliated vehicle (Solaris VC Fund, Xeta Capital Fund, Ripple Shares Arbitrage Fund) to attach to each investor, and whether to permit withdrawal demands, was concentrated in King personally rather than exercised through corporate governance of the Brookline Entities.

141. The Brookline Entities and King commingled corporate and personal functions in the operation of the Program. King received Moreira's investor capital directly into King's personal digital wallets

(0x2F9CfE2b9dD28AF1DB6f04a8B2aA726678d44B8c, 0x981B3f1Ec319C84BfA65246Ebf58Cd5663C4DB71, and 0x02844Adbc309Aa3ae0959eDf2C388Edbd87CEe1c) rather than into any Brookline Entity account. King opened and titled MetaTrader trading accounts for Moreira's capital in King's own personal name rather than in Moreira's name or in the name of any Brookline Entity. Osorio's investment capital was received through Brookline Investments wire infrastructure on at least one occasion (the May 31, 2023 wire acknowledged in writing by the Brookline Investments Chief Financial Officer) and solicited through the Brookline Group email domain on at least one occasion (the January 27, 2024 Ripple Shares Arbitrage Fund solicitation), yet the solicitations referenced vehicles (Solaris VC Fund, Xeta Capital Fund) distinct from the named corporate seller, with no documented contract, offering circular, or disclosure specifying which Brookline entity bore counterparty or custodial responsibility to the investor at any given time.

142. On information and belief, the Brookline Entities failed to observe ordinary corporate formalities in connection with the Program, including maintaining separate books and records sufficient to distinguish Program-related receipts, disbursements, and investor obligations from King's personal activity and from each other, and failed to document which entity assumed responsibility to investors at any given stage of the solicitation-funding-management chain. Specific

facts regarding corporate formalities, capitalization, separate books, and distribution of Program-related proceeds between the Brookline Entities and King personally are within the exclusive knowledge of Defendants and will be developed through discovery.

143. King and the Brookline Entities used the corporate form to perpetrate the fraudulent conduct alleged herein. The institutional holdings-out of the Brookline Entities as a legitimate investment-advisory operation furnished the appearance of regulatory legitimacy that enabled King to solicit Plaintiffs' investments; the actual deployment of the solicited capital through King's personal wallets, through MetaTrader accounts in King's own name, and through an unregistered offshore trading platform (Vortex FX) was concealed from Plaintiffs behind that institutional appearance.

144. Observance of the separate corporate existence of the Brookline Entities, if any such separate existence can be shown, would sanction a fraud or promote injustice as to Plaintiffs under Alabama law. Plaintiffs seek to pierce the corporate veil and hold King and the Brookline Entities jointly and severally liable as alter egos of one another.

## XII. CAUSES OF ACTION

### COUNT I
**Unlawful Off-Exchange Retail Commodity and Retail Forex Transactions**
**7 U.S.C. §§ 2(c)(2)(C), 2(c)(2)(D), and 6(b)**
**Private Right of Action under 7 U.S.C. § 25(a)(1)(D)**
*Plaintiff Moreira against All Defendants*

145. Plaintiff Moreira incorporates by reference paragraphs 1-13, 14-22, 27-42, 112-144, and the Moreira-specific allegations in paragraphs 76-111 as if fully set forth herein. Plaintiff Moreira does not incorporate the paragraphs addressing the eligible-contract-participant status of Barber and Osorio for purposes of this Count.

146. Section 2(c)(2)(D) of the Commodity Exchange Act, 7 U.S.C. § 2(c)(2)(D), governs any agreement, contract, or transaction in any commodity that is entered into with, or offered to, a person who is neither an eligible contract participant nor an eligible commercial entity, on a leveraged or margined basis, where the transaction does not result in actual delivery within 28 days. Such transactions are retail commodity transactions. Section 2(c)(2)(C) similarly governs retail forex transactions.

147. Plaintiff Moreira is not, and at all times material to this action has not been, an eligible contract participant within the meaning of 7 U.S.C. § 1a(18).

148. The leveraged spot gold (XAU/USD) and foreign-exchange CFD transactions offered and solicited by Defendants through the Program constituted retail commodity transactions under 7 U.S.C. § 2(c)(2)(D) and retail forex

transactions under 7 U.S.C. § 2(c)(2)(C). Moreira's principal MetaTrader account, Account 294923, was configured at 500-to-1 leverage. The transactions did not result in actual delivery of any commodity to Moreira within the meaning of 7 U.S.C. § 2(c)(2)(D)(ii)(III)(aa). *See CFTC v. Hunter Wise Commodities, LLC*, 749 F.3d 967 (11th Cir. 2014).

149. Section 4(b) of the Commodity Exchange Act, 7 U.S.C. § 6(b), as applied through 7 U.S.C. §§ 2(c)(2)(C)(vii) and 2(c)(2)(D)(iii), makes it unlawful to offer, enter into, or confirm the execution of any retail forex or retail commodity transaction unless the transaction is conducted on or subject to the rules of a designated contract market or registered foreign board of trade, or unless conducted by a permitted counterparty registered in the applicable capacity.

150. Defendants offered, solicited, accepted orders for, intermediated, and otherwise dealt in retail forex and retail commodity transactions with Moreira that were not conducted on or subject to the rules of any designated contract market, registered foreign board of trade, or permitted counterparty registered with the CFTC or NFA. The transactions were instead executed through Vortex FX, an entity not registered in any such capacity in the United States.

151. Moreira is entitled to maintain a private right of action under 7 U.S.C. § 25(a)(1)(D) because the violations constituted willful violations of the Commodity Exchange Act that directly caused injury to Moreira in connection with the

placement of orders for, and the trading of, contracts of the type described in 7 U.S.C. § 25(a)(1)(B).

152. As a direct and proximate result of Defendants' violations, Moreira has suffered actual damages, including the loss of his $1,490,892.67 principal investment and lost investment gains.

**COUNT II**
**CEA Anti-Fraud Violations**
**7 U.S.C. § 6b**
**Private Right of Action under 7 U.S.C. § 25(a)(1)(B)**
*All Plaintiffs against All Defendants*

153. Plaintiffs incorporate by reference paragraphs 1-42 and 112-144, and the plaintiff-specific allegations in paragraphs 43-58 (Barber), 59-75 (Osorio), and 76-111 (Moreira) as if fully set forth herein.

154. Section 4b of the Commodity Exchange Act, 7 U.S.C. § 6b, prohibits any person from cheating, defrauding, or deceiving any other person, or willfully making or causing to be made any false report or statement, in connection with any contract of sale of any commodity in interstate commerce or for future delivery, and in connection with any retail forex or retail commodity transaction.

155. In connection with the solicitation of Plaintiffs' investments and the subsequent management of the Program, King made the particularized misrepresentations and omissions set forth in the following paragraphs. Each is pleaded with particularity under Federal Rule of Civil Procedure 9(b).

156. **Representations to Plaintiff Barber**. The introductory email that arranged Barber's first conversation with King was sent from a Brookline email address and identified King as affiliated with Brookline, a representation of existing fact on which Barber relied in conducting pre-investment due diligence and in agreeing to speak with King. On the August 3, 2023 conference call among Barber, King, and Osorio, King represented to Barber that he had worked for ten years as a trader and that he was working on measures to provide investors with individual accounts and a better risk-management system. On March 12, 2024, in a call arranged by Barber's text message that day, King represented to Barber (a) that the Program was now set up with individual accounts, (b) that stop losses and other safeguards were in place, and (c) that with those controls Barber's account would not be subject to a catastrophic loss. Each March 12, 2024 representation was a representation of existing fact. Each was false when made or was made with reckless disregard for its truth. Barber's funds were in fact pooled with those of other investors and routed through multiple undisclosed entities, as reflected in King's April 3, 2024 clarification email describing the XCF sub-account mirroring structure. The Program's risk-management parameters were abandoned, overridden, or never fully implemented, as reflected in Vortex FX's April 2, 2024 admission of a "deviation" from the 50% drawdown kill switch, King's April 23, 2024 admission that he had approved "an additional drawdown amount" after the 30% stops were

hit, and King's October 3, 2024 admission that "[t]he 30% stop limit was removed." In direct reliance on King's March 12, 2024 representations, Barber funded his investment between March 15 and April 4, 2024.

157. **Representations to Plaintiff Osorio**. In May 2023, Brookline Investments, through its Chief Financial Officer and through the Confidential Offering Materials for Solaris VC, LLC, represented to Osorio that Brookline Investments was an SEC-registered investment adviser serving as Manager and Investment Adviser of Solaris VC, and that King was an Investment Advisory Representative of Brookline Investments and the Manager's authorized representative. In reliance, Osorio wired $25,000 to Solaris VC, LLC on May 31, 2023. Before Osorio's October and November 2023 USDC transfers, King represented to Osorio, repeatedly and in detail, (a) that trading in the Program would be conducted by algorithm only, (b) that trading would be governed by an agreed maximum drawdown limit, and (c) that upon transfer of Osorio's capital to the Vortex platform Osorio would be able to begin withdrawals. Each was a representation of existing fact or of a presently intended course of conduct. In reliance, Osorio transferred 994,417.99 USDC to King's personal wallet in three transfers between October 26 and November 20, 2023. Each representation was false when made or was made with reckless disregard for its truth: the late-February 2024 wipe-out resulted from trading that was not conducted by algorithm and did not

respect the agreed drawdown limit, as King acknowledged in writing on April 3, 2024; and Osorio's withdrawal requests beginning in January 2024 were not honored. On January 27, 2024, King further represented to Osorio, through his Brookline Group signature block, that securities were offered through a registered broker-dealer, Castle Hill Capital Partners, Inc., a representation of regulatory legitimacy on which Osorio relied in continuing his relationship with King.

158. **Representations to Plaintiff Moreira**. King made the following particularized representations to Moreira, each paired with the specific dated act of investment Moreira undertook in reliance on it. Each representation was material, was a representation of existing or present fact rather than aspirational commentary, and was false when made or was made with reckless disregard for its truth.

159. First, on November 3, 2023, during the initial Google Meet sent from mking@brookline-group.com, King represented to Moreira that King had prior trading experience as a trader at the Chicago Mercantile Exchange, that King was the intermediary responsible for defining strategies and managing the trading robots, and that the Program involved trading gold (mainly) and currency pairs. In reliance on those representations, on November 17, 2023 Moreira transferred $90,000 (net 89,997.47 USDC) to King's personal wallet 0x2F9CfE2b9dD28AF1DB6f04a8B2aA726678d44B8c (tx hash 0x1ff9a215...). The CME-trader representation was false or made with reckless disregard: no CME-

filed Form 8-R, Form U4, or other registration record identifies King as a CME associated person for the ten-year period he represented.

160. Second, between November 17, 2023 and February 5, 2024, Moreira received a series of automated growth reports from reporting@m3bvi.com representing specific USDC balances in his purported account, including 183,426.58 USDC on January 27, 2024, 185,983.75 USDC on January 29, 2024, 188,502.19 USDC on January 30, 2024, 190,828.91 USDC on January 31, 2024, 193,088.80 USDC on February 1, 2024, 296,754.23 USDC on February 2, 2024, and 300,689.70 USDC on February 5, 2024. Each report was a specific numerical representation of an existing account balance on the stated date, not opinion or forward-looking statement. In reliance on those reports, Moreira made additional investments of $100,000 on January 31, 2024 (tx hash 0x9714dde0...), $200,000 on February 6, 2024 (tx hash 0x38705ac0...), and $101,000 on February 9, 2024 (tx hash 0x0634ec93...). The reported balances were false or made with reckless disregard: the pooled Program funds were deployed through XCF sub-account mirroring and Vortex FX trading that did not generate the daily returns the automated reports represented, as later confirmed by King's own April 3, 2024 clarification email.

161. Third, on February 18, 2024, at the in-person lunch at The Continuum in Miami Beach, Florida, King made the following specific representations to Moreira: (a) that King had personally lost approximately $500,000 of his own

cryptocurrency through a mistyped wallet address, which he displayed on his phone to Moreira (an existing-fact representation of King's personal wealth and track record); (b) that a MetaTrader application on King's phone displayed a balance of approximately $31,000,000 attributable to the Program (an existing-fact representation of the Program's then-current size); (c) that King had already withdrawn significant profits from the Program (an existing-fact representation of the Program's redemption performance); (d) that another investor's daughters had bothered King by asking too many questions about the strategy (an existing-fact representation about King's dealings with other investors); and (e) that the Program was nearing its investment capacity (an existing-fact representation about the Program's current state as of February 18, 2024). In direct reliance on those representations, Moreira transferred $500,000 to King on February 21, 2024 (tx hash 0xaa24e46a...) and $500,000 to King on February 27, 2024 (tx hash 0xa2c987da...). Each representation was false or made with reckless disregard: the $31,000,000 MetaTrader display did not reflect the actual trading or redemption state of the pooled Program capital, as King knew; the "nearing capacity" representation was false in light of King's continued solicitation of additional investor funds thereafter.

162. Fourth, on February 22, 2024, King sent a mass email representing that the Program's new 50/50 profit-split arrangement was "a lot more transparent" than "prior deals through Brookline Investments Solaris Fund and Xeta Capital Fund."

That representation was a specific representation of present fact about transparency and about the institutional architecture of the Program, not opinion. It was false or made with reckless disregard: Moreira received no corresponding transparency into the Program's operations, counterparties, or risk parameters, and the Brookline Investments Solaris Fund and Xeta Capital Fund references confirmed to Moreira (for the first time) that his capital had been deployed through pooled Brookline-affiliated vehicles rather than any individual trading account.

163. King omitted to disclose to each Plaintiff material facts regarding the Program, including (a) that Plaintiffs' funds would be pooled and routed through multiple undisclosed entities (including the Brookline Entities, the Xeta Capital Fund, and King's personal digital wallets); (b) that neither King, the Brookline Entities, nor Vortex FX was registered with the CFTC or NFA in any capacity authorized to intermediate or counterparty retail commodity transactions with United States persons; (c) that the Program's represented risk-management parameters would be, or had been, abandoned or overridden; and (d) that account balances reflected in Plaintiffs' MetaTrader statements and in the reporting@m3bvi.com reports did not reflect the actual trading results of the pooled funds.

164. The Brookline Entities, acting through their principal King, their email infrastructure, and their corporate holdings-out, participated in and furnished the

institutional appearance for the misrepresentations and omissions alleged above. Brookline Group furnished the email domain and corporate holding-out used to make the November 3, 2023 and November 16, 2023 Google Meet solicitations to Moreira from mking@brookline-group.com and the January 27, 2024 "Ripple Shares Arbitrage Fund" solicitation to Osorio from mking@brookline-group.com. Brookline Investments, as the SEC-registered Manager and Investment Adviser of Solaris VC, LLC, furnished the offering materials, subscription administration, and wire instructions for Osorio's May 31, 2023 investment of $25,000 through its Chief Financial Officer, confirmed receipt on June 1, 2023, and through its President issued the January 25, 2024 Ripple Share Arbitrage Fund solicitation.

165. King acted with scienter in making the above representations and omissions, as evidenced by his own contemporaneous admissions set forth in Section IX above. Each Plaintiff reasonably relied upon the misrepresentations and omissions in making and continuing his investments.

166. Each Plaintiff has a private right of action under 7 U.S.C. § 25(a)(1)(B) for the violations alleged in this Count, regardless of each Plaintiff's status as an eligible contract participant, because 7 U.S.C. § 25(a)(1)(B) does not condition the private right of action on ECP status.

167. As a direct and proximate result of Defendants' violations, Plaintiffs have suffered actual damages, including the loss of their principal investments and

lost investment gains.

**COUNT III**
**CEA Fraud as Commodity Trading Adviser and Commodity Pool Operator**
**7 U.S.C. § 6o**
**Private Right of Action under 7 U.S.C. § 25(a)(1)(A) and (B)**
*All Plaintiffs against All Defendants*

168. Plaintiffs incorporate by reference paragraphs 1-42 and 112-144, and the plaintiff-specific allegations in paragraphs 43-58 (Barber), 59-75 (Osorio), and 76-111 (Moreira) as if fully set forth herein.

169. Section 4o of the Commodity Exchange Act, 7 U.S.C. § 6o, applies by its terms to any commodity trading adviser (CTA) and any commodity pool operator (CPO), whether or not registered. Section 4o prohibits any such person from employing any device, scheme, or artifice to defraud any client, participant, or prospective participant, or from engaging in any transaction, practice, or course of business that operates as a fraud or deceit upon any client, participant, or prospective participant.

170. King acted as a commodity trading adviser within the meaning of 7 U.S.C. § 1a(12) by, for compensation or profit, engaging in the business of advising Plaintiffs as to the value of or the advisability of trading in commodity interests. Defendants collectively acted as commodity pool operators within the meaning of 7 U.S.C. § 1a(11) by soliciting, accepting, and receiving funds from multiple participants for the purpose of trading in commodity interests, and by operating the

pooled vehicles described in Section X above.

171. The misrepresentations, omissions, and course of fraudulent conduct detailed in Count II above constituted employment of a device, scheme, or artifice to defraud Plaintiffs as clients and participants, and a course of business that operated as a fraud and deceit upon Plaintiffs, within the meaning of 7 U.S.C. § 6o.

172. Each Plaintiff has a private right of action under 7 U.S.C. § 25(a)(1)(A) and (B) for the violations alleged in this Count.

173. As a direct and proximate result of Defendants' violations, Plaintiffs have suffered actual damages, including the loss of their principal investments and lost investment gains.

## COUNT IV
**Aiding and Abetting Violations of the Commodity Exchange Act**
**7 U.S.C. §§ 13c(a) and 25(a)(1)**
*All Plaintiffs against All Defendants*

174. Plaintiffs incorporate by reference paragraphs 1-42 and 112-144, and the plaintiff-specific allegations in paragraphs 43-58 (Barber), 59-75 (Osorio), and 76-111 (Moreira) as if fully set forth herein.

175. Section 13c(a) of the Commodity Exchange Act, 7 U.S.C. § 13c(a), imposes liability on any person who willfully aids, abets, counsels, induces, or procures the commission of any violation of the Commodity Exchange Act, or who acts in combination or concert with any other person in any such violation.

176. Pursuant to Federal Rule of Civil Procedure 8(d)(2), and to make the

primary-violator and aider-abettor allocations explicit as among Defendants, Plaintiffs allege as follows:

177. First, with respect to violations of 7 U.S.C. § 6d (acting as an unregistered introducing broker), Brookline Investments and Brookline Group are the primary violators, by virtue of their corporate sponsorship and use of their corporate infrastructure to intermediate Plaintiffs' retail commodity transactions. King is liable as aider and abettor of the Brookline Entities' primary violations, by virtue of his role as principal of the Brookline Entities, his direction of the unregistered intermediation activity, and his personal solicitation and onboarding of Plaintiffs.

178. Second, with respect to violations of 7 U.S.C. § 6m(1) (acting as an unregistered commodity pool operator), Brookline Group is the primary violator as the entity whose name and email infrastructure were used to operate the pooled vehicles identified herein (including by way of the November 3, 2023 and November 16, 2023 Google Meet solicitations to Moreira and the January 27, 2024 "Ripple Shares Arbitrage Fund" solicitation to Osorio, each from mking@brookline-group.com). King is liable as aider and abettor of Brookline Group's primary violation.

179. Third, with respect to the fraud-based violations under 7 U.S.C. §§ 6b and 6o as alleged in Counts II and III, King is the primary violator. The Brookline

Entities are liable as aiders and abettors of King's primary violations, by virtue of their corporate sponsorship, email infrastructure, wire infrastructure, and ratification of King's conduct, which lent the Program its institutional appearance and enabled King to perpetrate the fraud alleged herein.

180. Each Defendant had actual knowledge of the violations alleged herein, or acted with reckless disregard for the violations, and each Defendant provided substantial assistance to the violations by one or more of the following acts: soliciting Plaintiffs' investments, transmitting funds, communicating with Plaintiffs regarding the Program, collecting Know-Your-Customer documentation, executing or directing trades, managing or representing risk parameters, suppressing material information, obstructing redemption demands, and furnishing corporate infrastructure, email infrastructure, and wire infrastructure for the Program.

181. As a direct and proximate result of Defendants' violations, Plaintiffs have suffered actual damages.

## COUNT V
## Federal Securities Fraud
## Section 10(b) of the Securities Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b-5 (17 C.F.R. § 240.10b-5)

*All Plaintiffs against All Defendants*

182. Plaintiffs incorporate by reference paragraphs 1-42 and 112-144, and the plaintiff-specific allegations in paragraphs 43-58 (Barber), 59-75 (Osorio), and 76-111 (Moreira) as if fully set forth herein.

183. The pooled investment interests offered and sold by Defendants, including interests in the commodity pool described herein and in the earlier "Solaris VC Fund" and "Xeta Capital Fund" vehicles King referenced in his February 22, 2024 mass email, constitute securities within the meaning of Section 3(a)(10) of the Securities Exchange Act of 1934, 15 U.S.C. § 78c(a)(10), as investment contracts under *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946). Plaintiffs invested money in a common enterprise with the expectation of profits derived from the efforts of King, the trader Kingsley, and the Brookline Entities. For purposes of Plaintiff Barber, this Count is pleaded in the alternative to Counts I through IV under Federal Rule of Civil Procedure 8(d)(2).

184. Rule 10b-5 makes it unlawful, in connection with the purchase or sale of any security, to employ any device, scheme, or artifice to defraud; to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made not misleading; or to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

185. King made the material misrepresentations and omissions detailed in Count II above in connection with the purchase of pooled investment interests by Plaintiffs. The Brookline Entities furnished the corporate sponsorship, infrastructure, and holdings-out that enabled King to present the Program as the

institutional offering of a legitimate investment-advisory business.

186. King acted with scienter. King's scienter is established by, among other evidence, King's own contemporaneous written admissions, including: (a) on April 23, 2024, King's admission that after 30% stops were hit, he had "approved an additional drawdown amount" which was "not a very helpful decision"; (b) on October 3, 2024, King's admission that "[t]he 30% stop limit was removed" and that he had been "unaware of this at the time"; (c) on October 17, 2024, King's admission that "I am pausing all trading" because the strategy was "certainly not a good fit for the existing market"; (d) on November 21, 2024, King's admission that the trading algorithm had failed to recognize open positions and that Xeta was "still a quagmire"; (e) on December 12, 2024, King's admission that the trader's "continual complete disregard of everything I have been trying to implement" had led King to forbid trading; and (f) on December 16, 2024, King's "wrong entity" response to Osorio's withdrawal demand, confirming the multi-entity structure King had used throughout. Each admission is a direct contemporaneous statement by the principal Defendant evidencing actual knowledge of, or at minimum reckless disregard for, the falsity of his pre-investment representations to Plaintiffs. These admissions give rise to a strong inference of scienter sufficient to satisfy the heightened pleading requirements of the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(b)(2).

187. Each Plaintiff reasonably relied upon the misrepresentations and omissions in making and continuing his investments. Each Plaintiff has suffered economic loss as a direct and proximate result of Defendants' violations of Section 10(b) and Rule 10b-5. Defendants' misrepresentations and omissions caused Plaintiffs' losses within the meaning of 15 U.S.C. § 78u-4(b)(4).

**COUNT VI**
**Florida Securities and Investor Protection Act**
**Fla. Stat. §§ 517.301 and 517.211**
*Plaintiffs Osorio and Moreira against All Defendants*

188. Plaintiffs Osorio and Moreira incorporate by reference paragraphs 1-42 and 112-144, the Osorio-specific allegations in paragraphs 59-75, and the Moreira-specific allegations in paragraphs 76-111, as if fully set forth herein.

189. Florida Statutes § 517.301 makes it unlawful for any person, in connection with the rendering of any investment advice or in connection with the offer, sale, or purchase of any security in Florida, directly or indirectly, (a) to employ any device, scheme, or artifice to defraud; (b) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made not misleading; or (c) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a person.

190. Florida Statutes § 517.211 provides a private right of action for rescission or damages, together with attorneys' fees and costs, to any person

purchasing a security in violation of Florida Statutes § 517.301.

191. Osorio relocated his residence to Florida in June 2023 and has been a Florida resident since. Each of Osorio's investments in the Program, including the three USDC transfers of October 26, October 31, and November 20, 2023 totaling 994,417.99 USDC and the additional transfers of approximately $100,000 in the same period, was made from Florida while Osorio was a Florida resident. The pre-investment representations King made to Osorio regarding algorithm-only trading, the agreed maximum drawdown, and withdrawal availability were directed to Osorio in Florida. King's January 27, 2024 Ripple Share Arbitrage Fund solicitation and his subsequent communications regarding that offering were likewise directed to Osorio in Florida. Osorio's weekly telephone calls with King throughout 2024 requesting withdrawal, and King's responses, occurred while Osorio was in Florida. Osorio's May 2023 Solaris VC investment, made while Osorio resided in Alabama, is not asserted under this Count.

192. As to Plaintiff Moreira, the conduct giving rise to liability under Fla. Stat. § 517.301 includes solicitations and meetings directed to and conducted within the State of Florida, including: (a) the February 18, 2024 in-person lunch between King and Moreira at The Continuum in Miami Beach, Florida, which King represented to be his second home and which served as the site of the specific representations detailed in paragraph 97 above; (b) communications from King to

Moreira through the madding@m3bvi.com and reporting@m3bvi.com email addresses, including the series of daily automated growth reports from January 27, 2024 through February 5, 2024; (c) post-loss communications from King regarding the abandonment of represented risk controls and the multi-entity restructuring; and (d) Moreira's subsequent communications with Kingsley and Vortex FX personnel from Florida.

193. Defendants' conduct constitutes violations of Fla. Stat. § 517.301 as to Osorio and Moreira. Osorio and Moreira are entitled to rescission or damages, together with attorneys' fees and costs, under Fla. Stat. § 517.211.

## COUNT VII
## Fraudulent Inducement / Intentional Misrepresentation
## Ala. Code § 6-5-101
*All Plaintiffs against Defendant King*

194. Plaintiffs incorporate by reference paragraphs 1-42 and 112-144, and the plaintiff-specific allegations in paragraphs 43-58 (Barber), 59-75 (Osorio), and 76-111 (Moreira) as if fully set forth herein.

195. Alabama Code § 6-5-101 provides that misrepresentations of a material fact made willfully to deceive, or recklessly without knowledge, and acted on by the opposite party, or if made by mistake and innocently and acted on by the opposite party, constitute legal fraud.

196. King made the particularized representations identified in Count II above to each Plaintiff. Those representations were material to each Plaintiff's

investment decision. Each representation was false when made or was made with reckless disregard for its truth.

197. King made the representations with the intent that Plaintiffs rely on them to make and continue their investments in the Program. Each Plaintiff reasonably relied on King's representations in making and continuing his investment, and each Plaintiff would not have invested, or would have withdrawn his investment, had he known the truth.

198. As a direct and proximate result of King's fraudulent inducement, Plaintiffs have suffered actual damages. Plaintiffs are entitled to compensatory and punitive damages under Alabama Code § 6-11-20.

## COUNT VIII
**Fraudulent Suppression**
**Ala. Code § 6-5-102**
*All Plaintiffs against Defendant King*

199. Plaintiffs incorporate by reference paragraphs 1-42 and 112-144, and the plaintiff-specific allegations in paragraphs 43-58 (Barber), 59-75 (Osorio), and 76-111 (Moreira) as if fully set forth herein.

200. Alabama Code § 6-5-102 provides that suppression of a material fact which a party is under an obligation to communicate constitutes fraud. Such an obligation may arise from the confidential relations of the parties or from the particular circumstances of the case.

201. King stood in a position of trust and confidence with respect to each

Plaintiff, having undertaken sole responsibility for the solicitation, onboarding, funding, management, and reporting of each Plaintiff's investment, having held himself out as a sophisticated financial professional and principal of the Brookline Entities, and having held and controlled Moreira's investor capital directly in King's personal digital wallets (0x2F9CfE2b9dD28AF1DB6f04a8B2aA726678d44B8c, 0x981B3f1Ec319C84BfA65246Ebf58Cd5663C4DB71, and 0x02844Adbc309Aa3ae0959eDf2C388Edbd87CEe1c), with MetaTrader accounts titled in King's name rather than Moreira's.

202. King was under an obligation to disclose to each Plaintiff the material facts suppressed, including but not limited to: (a) that Plaintiffs' funds would be or had been pooled and routed through multiple undisclosed entities, including the Xeta Capital Fund and King's personal digital wallets; (b) that neither King, the Brookline Entities, nor Vortex FX was registered with the CFTC or NFA in any capacity authorized to intermediate or counterparty retail commodity transactions with United States persons; (c) that the Program's represented risk-management parameters would be, or had been, abandoned or overridden, including the 50% drawdown kill switch and the 30% stop limit; and (d) that account balances reflected in Plaintiffs' MetaTrader statements and in the reporting@m3bvi.com automated reports did not reflect the actual trading results of the pooled funds.

203. King willfully suppressed these material facts with the intent to deceive

each Plaintiff. Each Plaintiff reasonably relied on the absence of such disclosures in making and continuing his investment.

204. As a direct and proximate result of King's fraudulent suppression, Plaintiffs have suffered actual damages. Plaintiffs are entitled to compensatory and punitive damages under Alabama Code § 6-11-20.

## COUNT IX
**Breach of Fiduciary Duty**
*All Plaintiffs against Defendant King*

205. Plaintiffs incorporate by reference paragraphs 1-42 and 112-144, and the plaintiff-specific allegations in paragraphs 43-58 (Barber), 59-75 (Osorio), and 76-111 (Moreira) as if fully set forth herein.

206. King owed each Plaintiff fiduciary duties of care, loyalty, candor, and good faith. As to Osorio, those duties arose as a matter of federal law from King's status as an Investment Advisory Representative of Brookline Investments, an SEC-registered investment adviser, in connection with the Solaris VC investment that Brookline Investments managed and advised. As to all Plaintiffs, those duties arose from King's assumption of sole intermediary responsibility for each Plaintiff's investment, his discretionary control over the account-setup and funding process, his control over the Program's risk parameters and account "credits," his personal receipt of Moreira's investment funds in King's own digital wallets, his control over MetaTrader accounts titled in King's own name rather than in Moreira's, and his

control over whether and when Plaintiffs could withdraw their funds.

207. King breached his fiduciary duties to each Plaintiff by, among other things, misrepresenting material facts regarding the Program; suppressing material facts regarding the Program; permitting or directing the pooling of Plaintiffs' funds in violation of pre-investment representations; permitting the abandonment or override of represented risk-management parameters (including the 50% drawdown kill switch and the 30% stop limit); failing to disclose the multi-entity structure through which Plaintiffs' funds were deployed; and refusing to permit withdrawals despite demand.

208. As a direct and proximate result of King's breaches of fiduciary duty, Plaintiffs have suffered actual damages. Plaintiffs are entitled to compensatory damages, punitive damages under Alabama Code § 6-11-20, disgorgement of profits, and an accounting.

## COUNT X
**Conversion**
*All Plaintiffs against All Defendants*

209. Plaintiffs incorporate by reference paragraphs 1-42 and 112-144, and the plaintiff-specific allegations in paragraphs 43-58 (Barber), 59-75 (Osorio), and 76-111 (Moreira) as if fully set forth herein.

210. Plaintiffs transferred specific, identifiable funds to Defendants, including: Barber's four USDC transfers totaling approximately $990,478.44, fully

funded by April 4, 2024, to deposit address 0x6fbd24f2143e0e93ba7d93edb218e0f3bf1e4cb1; Moreira's six USDC transfers totaling 1,490,892.67 USDC net received by King between November 17, 2023 and February 27, 2024 at the wallet addresses and transaction hashes detailed in paragraphs 82-102 above; Osorio's $25,000 wire to Solaris VC, LLC on May 31, 2023, received and acknowledged by Brookline Investments on June 1, 2023; and Osorio's three USDC transfers totaling 994,417.99 USDC to King's personal wallet 0x2F9CfE2b9dD28AF1DB6f04a8B2aA726678d44B8c between October 26 and November 20, 2023, at the transaction hashes detailed in Section VII above.

211. Defendants have exercised dominion and control over Plaintiffs' funds inconsistent with Plaintiffs' ownership rights, by refusing to permit Plaintiffs to withdraw their funds despite demand, by continuing to use or benefit from Plaintiffs' pooled funds, and by representing that withdrawals cannot occur until unspecified recoupment conditions are satisfied.

212. Plaintiffs have demanded return of their funds; Defendants have refused. As a direct and proximate result of Defendants' conversion of Plaintiffs' funds, Plaintiffs have suffered actual damages. Plaintiffs are entitled to compensatory and punitive damages under Alabama law.

## COUNT XI
**Civil Conspiracy**
*All Plaintiffs against All Defendants*

213. Plaintiffs incorporate by reference paragraphs 1-42 and 112-144, and the plaintiff-specific allegations in paragraphs 43-58 (Barber), 59-75 (Osorio), and 76-111 (Moreira) as if fully set forth herein.

214. King and the Brookline Entities, acting in concert and in combination with each other, conspired to commit the tortious and statutory violations alleged in this Complaint, including fraudulent inducement, fraudulent suppression, breach of fiduciary duty, conversion, and the Commodity Exchange Act and securities violations alleged herein.

215. The intracorporate conspiracy doctrine does not bar this claim. First, King acted outside the scope of his agency for the Brookline Entities and for an independent personal benefit when he (a) received Moreira's investor capital directly into King's own personal digital wallets rather than into any Brookline Entity account; (b) opened and titled MetaTrader trading accounts for investor capital in King's own personal name rather than in the Brookline Entities' name; and (c) deployed Plaintiffs' pooled capital through an unregistered offshore trading platform (Vortex FX) and an unregistered non-United States trader (Kingsley) outside any lawful authority delegated to him by the Brookline Entities. Second, the conspiracy encompassed non-party actors Daniel Kingsley and VortexFX UK, who

are not agents of the Brookline Entities, placing the agreement outside the intracorporate limitation. Third, King's conduct in soliciting, pooling, and withholding Plaintiffs' funds served King's personal pecuniary interest in the retention and continued trading of that capital, including his personal profit-sharing arrangements with Vortex FX reflected in the April 29, 2024 Vortex FX letter.

216. Non-party Daniel Kingsley and non-party VortexFX UK, Ltd. further participated in the common scheme as the trader and the trading platform through which Plaintiffs' funds were purportedly deployed, as further evidenced by Kingsley's August 15, 2024 direct communication to Program investors. Plaintiffs reference Kingsley and VortexFX UK as co-conspirators for narrative purposes only; they are not named as Defendants in this Count, and Plaintiffs reserve the right to amend to add them following further jurisdictional analysis and further discovery.

217. The conspiracy was formed with knowledge of the wrongful objects and means and was performed through the overt acts alleged in this Complaint, including the solicitations, funding transfers, misrepresentations, suppression of material facts, abandonment of risk parameters, concealment of losses, and refusals to permit withdrawals, each of which was done in furtherance of the conspiracy.

218. As a direct and proximate result of the conspiracy, Plaintiffs have suffered actual damages. Each Defendant is jointly and severally liable for the damages caused by the conspiracy under Alabama law. Plaintiffs are entitled to

compensatory and punitive damages under Alabama Code § 6-11-20.

**COUNT XII**
**Unjust Enrichment / Restitution (In the Alternative)**
*All Plaintiffs against All Defendants*

219. Plaintiffs incorporate by reference paragraphs 1-42 and 112-144, and the plaintiff-specific allegations in paragraphs 43-58 (Barber), 59-75 (Osorio), and 76-111 (Moreira) as if fully set forth herein. This Count is pleaded in the alternative pursuant to Federal Rule of Civil Procedure 8(d)(2).

220. Defendants have received and retained the benefit of Plaintiffs' funds, including Barber's approximately $990,478.44 principal, Moreira's $1,490,892.67 principal, and Osorio's principal of approximately $1,250,000, of which $1,019,417.99 is documented by wire and blockchain records, without providing Plaintiffs the investment services, risk management, segregated accounts, or regulated access to retail commodity transactions that King represented to Plaintiffs would be provided.

221. Defendants have been enriched by the receipt and retention of Plaintiffs' funds notwithstanding any trading losses reflected on the Program's purported account statements. The specific forms of enrichment include, without limitation: (a) King's personal custody and control of Moreira's investor capital through three identified personal digital wallets, from which King was able to and did direct the subsequent movement of those funds; (b) the performance-fee and

compensation-recoupment arrangement between the Program and Vortex FX acknowledged in the April 29, 2024 Vortex FX letter, pursuant to which Defendants and their collaborators recouped representational "compensation" payments by applying them against future investor gains before any investor could withdraw; (c) King's own written representation on March 28, 2025 that he had been operating a $100,000 personal account on the Vortex FX platform concurrently with Plaintiffs' frozen accounts; (d) Defendants' continued control over Plaintiffs' purported account balances and the Program's trading infrastructure, which Defendants have used and continue to use to generate fees, profits, or other economic benefits for themselves and their collaborators; (e) King's November 11, 2024 admission to Moreira that the post-loss credited balances in investor accounts were "borrowed capital" placed "off balance sheet" by the trading platform, and Defendants' representation to Barber that Barber's account had been "credited" back to its original starting balance, coupled with the trader's continuing refusal to release those credited funds despite Barber's repeated demands, which confirms that funds sufficient to make Barber whole were within Defendants' and their collaborators' control and were deliberately withheld; and (f) Defendants' continuing refusal to permit withdrawals, which operates to retain Plaintiffs' funds under Defendants' control indefinitely.

222. It would be inequitable and unjust for Defendants to retain the benefit

of Plaintiffs' funds. Plaintiffs are entitled to restitution of the amounts conferred upon Defendants, together with disgorgement of any profits, fees, performance recoupment, or other economic benefits realized from the use of Plaintiffs' funds.

## COUNT XIII
**Alabama Securities Act - Sale of Unregistered Securities**
**Ala. Code § 8-6-4; Private Right of Action under Ala. Code § 8-6-19**
*All Plaintiffs against All Defendants*

223. Plaintiffs incorporate by reference paragraphs 1-42 and 112-144, and the plaintiff-specific allegations in paragraphs 43-58 (Barber), 59-75 (Osorio), and 76-111 (Moreira) as if fully set forth herein.

224. Alabama Code § 8-6-4 makes it unlawful for any person to offer or sell any security in Alabama unless the security is registered under the Alabama Securities Act, the security or transaction is exempt, or the security is a federal covered security for which a notice filing has been made.

225. The pooled investment interests offered and sold by Defendants constitute securities within the meaning of Alabama Code § 8-6-2(10), as investment contracts under the Howey analysis incorporated into Alabama law.

226. Defendants offered and sold the pooled investment interests to Plaintiffs Barber and Osorio in Alabama. The pooled investment interests were not registered under the Alabama Securities Act, no valid exemption applies, and no notice filing for a federal covered security was made with respect to the offers and sales to Plaintiffs.

227. Pursuant to Alabama Code § 8-6-19(a)(1), Plaintiffs are entitled to recover the consideration paid for the securities, together with interest at the legal rate of six percent per annum from the date of payment, costs, and reasonable attorneys' fees, less the amount of any income received on the securities.

**COUNT XIV**
**Alabama Securities Act - Securities Fraud**
**Ala. Code § 8-6-17; Private Right of Action under Ala. Code § 8-6-19**
*All Plaintiffs against All Defendants*

228. Plaintiffs incorporate by reference paragraphs 1-42 and 112-144, and the plaintiff-specific allegations in paragraphs 43-58 (Barber), 59-75 (Osorio), and 76-111 (Moreira) as if fully set forth herein.

229. Alabama Code § 8-6-17 makes it unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly, to: (1) employ any device, scheme, or artifice to defraud; (2) make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or (3) engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

230. Defendants committed violations of Alabama Code § 8-6-17 by making the particularized misrepresentations and omissions alleged in Count II above, in connection with the offer and sale of the pooled investment interests to Plaintiffs.

231. Pursuant to Alabama Code § 8-6-19, Plaintiffs are entitled to rescission

of their purchases, or in the alternative to damages, together with interest at the legal rate of six percent per annum from the date of payment, costs, and reasonable attorneys' fees.

**COUNT XV**
**Alabama Securities Act - Control Person Liability**
**Ala. Code § 8-6-19(c)**
*All Plaintiffs against All Defendants*

232. Plaintiffs incorporate by reference paragraphs 1-42 and 112-144, the plaintiff-specific allegations in paragraphs 43-58 (Barber), 59-75 (Osorio), and 76-111 (Moreira), together with Counts XIII and XIV, as if fully set forth herein.

233. Alabama Code § 8-6-19(c) provides for the joint and several liability of every person who directly or indirectly controls a seller liable under Alabama Code § 8-6-19(a), every partner, officer, or director of such seller, every person occupying a similar status or performing similar functions, every employee of such seller who materially aids in the sale, and every broker-dealer, agent, or investment adviser who materially aids in the sale.

234. King is a control person of Brookline Group within the meaning of § 8-6-19(c) by virtue of his role as managing member, chief executive officer, and owner, and is a control person with respect to the activities of Brookline Investments at relevant times by virtue of his role as a managing director and investment adviser representative.

235. Brookline Group materially aided the offers and sales to Plaintiffs by

furnishing its name, email domain, and corporate infrastructure to the Program, including by way of the November 3, 2023 and November 16, 2023 Google Meet solicitations to Moreira and the January 27, 2024 "Ripple Shares Arbitrage Fund" solicitation to Osorio, each from mking@brookline-group.com. Brookline Investments materially aided the offers and sales as the SEC-registered Manager and Investment Adviser of Solaris VC, LLC, by furnishing its offering materials, subscription administration, and wire instructions to Osorio through its Chief Financial Officer in May 2023, by confirming receipt of Osorio's $25,000 investment on June 1, 2023, and by issuing, through its President Rainer Twiford, the January 25, 2024 Ripple Share Arbitrage Fund solicitation that King forwarded to Osorio.

236. King and the Brookline Entities are each jointly and severally liable with the seller for the full amount recoverable under Alabama Code § 8-6-19(a), including rescission, interest at the legal rate of six percent per annum from the date of payment, costs, and reasonable attorneys' fees.

## COUNT XVI
**Securities Act of 1933 - Sale of Unregistered Securities**
**15 U.S.C. §§ 77e and 77l(a)(1)**
*All Plaintiffs against All Defendants*

237. Plaintiffs incorporate by reference paragraphs 1-42 and 112-144, and the plaintiff-specific allegations in paragraphs 43-58 (Barber), 59-75 (Osorio), and 76-111 (Moreira) as if fully set forth herein.

238. Section 5 of the Securities Act of 1933, 15 U.S.C. § 77e, prohibits the offer or sale of any security, through any means or instruments of transportation or communication in interstate commerce or of the mails, unless a registration statement is in effect as to such security or unless the security or transaction is exempt from registration.

239. Section 12(a)(1) of the Securities Act of 1933, 15 U.S.C. § 77l(a)(1), provides a private right of action to any person purchasing a security sold in violation of Section 5. The remedy is rescission or, if the purchaser no longer owns the security, damages, together with interest.

240. The pooled investment interests offered and sold by Defendants constitute securities within the meaning of 15 U.S.C. § 77b(a)(1), as investment contracts under *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946).

241. Defendants offered and sold those pooled investment interests to Plaintiffs through interstate electronic communications and the mails, including the Google Meet solicitations to Moreira on November 3, 2023 and November 16, 2023 from mking@brookline-group.com; the mking@brookline-group.com solicitation to Osorio on January 27, 2024 for the Ripple Shares Arbitrage Fund; the account-setup email exchanges with Barber on March 13 and 14, 2024; the automated growth reports to Moreira from reporting@m3bvi.com between January 27, 2024 and February 5, 2024; and the interstate electronic transfers of USDC on the Ethereum

blockchain through which Plaintiffs funded their investments.

242. Upon information and belief, no registration statement was in effect as to the pooled investment interests at the time Defendants offered or sold them to Plaintiffs, no notice filing for a federal covered security was made with respect to the offers and sales to Plaintiffs, and no valid exemption from registration applies to the offers and sales to Plaintiffs.

243. Each Defendant was a statutory seller to each Plaintiff within the meaning of 15 U.S.C. § 77l(a) by directly offering and selling the pooled investment interests, by soliciting the sales for personal financial gain, and by directing the mechanics of each sale. King personally solicited and directed each Plaintiff's investment. Brookline Group furnished the corporate email identity (mking@brookline-group.com) used in multiple solicitations and benefited from each resulting sale. Brookline Investments was the direct seller of the Solaris VC, LLC interest to Osorio as its Manager and Investment Adviser, and materially participated in the Ripple Share Arbitrage Fund solicitation through its President.

244. Plaintiffs hereby tender their securities (or, with respect to securities they no longer own, the equivalent thereof) and seek rescission of their purchases, together with interest, under 15 U.S.C. § 77l(a)(1), or in the alternative damages in the amount of the consideration paid for the securities less any amount received on the securities, together with interest at the legal rate.

**COUNT XVII**
**Securities Exchange Act of 1934 - Control Person Liability**
**15 U.S.C. § 78t(a)**
*All Plaintiffs against All Defendants*

245. Plaintiffs incorporate by reference paragraphs 1-42 and 112-144, the plaintiff-specific allegations in paragraphs 43-58 (Barber), 59-75 (Osorio), and 76-111 (Moreira), and Count V (Federal Securities Fraud under Section 10(b) and Rule 10b-5) as if fully set forth herein.

246. Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a), provides that every person who, directly or indirectly, controls any person liable under any provision of the Exchange Act, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the acts constituting the violation.

247. Count V alleges a primary violation of Section 10(b) and Rule 10b-5 by Defendants in connection with the offer and sale of the pooled investment interests to Plaintiffs. This Count XVII asserts control-person liability for that primary violation.

248. King is a control person with respect to the Brookline Entities within the meaning of 15 U.S.C. § 78t(a). King was at all material times the managing member, chief executive officer, and owner of Brookline Group, and had been a managing director and investment adviser representative associated with Brookline

Investments. King directed and determined the content of the Program-related solicitations, communications, and representations sent through the Brookline Entities' corporate email infrastructure and the Brookline Investments wire infrastructure. King had, and exercised, the actual power to direct or cause the direction of the management and policies of the Brookline Entities with respect to the Program.

249. The Brookline Entities, in turn, are control persons with respect to King's conduct in connection with the Program to the extent that King acted within the course and scope of his agency for the Brookline Entities in executing the solicitations and communications constituting the primary violation. The Brookline Entities had the power to supervise and control King's use of their corporate email identities and wire infrastructure, and failed to do so.

250. King was a culpable participant in the primary violation alleged in Count V, as further established by King's own written admissions enumerated in paragraph 186 above. The Brookline Entities did not act in good faith with respect to the Program, and did not take reasonable steps to prevent King's use of their corporate infrastructure to perpetrate the primary violation.

251. Each Defendant is jointly and severally liable with the other Defendants, to the same extent as the primary violators, for the damages caused by the primary violation of Section 10(b) and Rule 10b-5 alleged in Count V.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, jointly and severally, and award the following relief:

(a) Compensatory damages in an amount to be proven at trial, including but not limited to the return of Plaintiffs' invested principal of not less than $3,500,000, and lost investment gains;

(b) Punitive damages pursuant to Alabama Code § 6-11-20 and applicable law;

(c) Rescission and disgorgement of all benefits unjustly retained by Defendants, including the consideration paid by Plaintiffs Osorio and Moreira pursuant to Fla. Stat. § 517.211, and the consideration paid by all Plaintiffs pursuant to Alabama Code § 8-6-19;

(d) Pre-judgment and post-judgment interest at the maximum rate permitted by law, including interest at the legal rate of six percent per annum on the consideration paid by Plaintiffs pursuant to Alabama Code § 8-6-19;

(e) Attorneys' fees and costs pursuant to Fla. Stat. § 517.211, Alabama Code § 8-6-19(a) and (c), and other applicable law;

(f) Equitable relief, including an accounting; the imposition of a constructive trust over Plaintiffs' funds and any traceable proceeds; and an order

preserving Defendants' assets, including but not limited to the digital wallets and MetaTrader accounts identified herein, pending resolution of this action; and

(g) Such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiffs hereby demand a trial by jury on all issues so triable, pursuant to Federal Rule of Civil Procedure 38.

Respectfully submitted,

/s/ William G. Somerville
WILLIAM G. SOMERVILLE

**OF COUNSEL:**
SOMERVILLE PEWITT LLP
2 North 20th Street, Suite 925
Birmingham, AL 35203
will@somervillepewitt.com

/s/ Braden M. Perry
BRADEN M. PERRY

**OF COUNSEL:**
KENNYHERTZ PERRY LLC
2000 Shawnee Mission Parkway, Suite 210
Mission Woods, KS 66205
braden@kennyhertzperry.com

/s/ Jade E. Sipes
JADE E. SIPES

**OF COUNSEL:**
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC
1901 Sixth Avenue N. Ste. 2600
Birmingham, Alabama 35203
jsipes@bakerdonelson.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing has been served upon all counsel of record via this Court's electronic filing system on this the 6th day of November, 2026.

/s/ Jade E. Sipes
OF COUNSEL